The STATE OF ARIZONA, ex rel. Grant WOODS, the Arizona Attorney General and the Arizona Department of Environmental Quality, Edward Z. Fox, Director; et al., Plaintiffs,

v.

NUCOR CORPORATION, a Delaware corporation, Defendants.

No. CIV 91–1094 PHX RCB.

United States District Court, D. Arizona.

Sept. 22, 1992.

Grant Woods, Steven J. Silver, Tamara L. Huddleston, Office of Atty. Gen., Phoenix, AZ, for plaintiffs.

Rolf von Oppenfeld, Christopher L. Callahan, Fennemore Craig, P.C., Phoenix, AZ, for Nucor Corp.

David G. Campbell, Shane R. Swindle, Meyer, Hendricks, Victor, Osborn & Maledon, P.A., Phoenix, AZ, for Components Inc.

· ORDER

BROOMFIELD, District Judge.

Plaintiff State of Arizona (the "State") and Nucor Corporation ("Nucor") jointly move for entry of a settlement agreement between the State and Nucor.[1] In response to public notice of the proposed settlement, three non-parties responded: Components Incorporated ("Components"), the Lenore U. Pincus Family Trust (the "Trust"), and Highland Products, Inc. ("Highland"). For various reasons, these three entities urged the court to either postpone or deny entry of the settlement agreement. At that time, Components also moved to intervene as a plaintiff in the action. The court permitted Components to intervene as a plaintiff.

The State and Nucor jointly responded to the comments. Components and Highland submitted supplemental comments and maintained their opposition to the proposed settlement agreement. Against objections by the State and Nucor, the court considered these supplemental comments and gave the State additional time to respond. Both Nucor and the State responded to the supplemental comments. Finally, Nucor submitted a citation of supplemental authority, which the court considers. After consideration of the parties' extensive briefs and oral argument, the court now rules.

## I. BACKGROUND INFORMATION

For several years during the early 1960s, Nucor allegedly owned and operated an electronic components manufacturing business at the West Osborn Complex (the "Facility"). (Complaint at 3–4.) In operation of this company, Nucor allegedly purchased and

---

1. Plaintiff's complaint against Nucor was filed contemporaneously with the joint motion. In its complaint, plaintiff alleges that Nucor is liable to the State under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9607, as a responsible party for removal, remedial, and response costs incurred by the State.

used listed hazardous substances, particularly trichloroethylene ("TCE"), which subsequently has been found in the soil and groundwater surrounding the Facility. (Complaint at 4.) In 1989, the Arizona Department of Environmental Quality ("ADEQ")[2] notified Nucor that groundwater in the vicinity of the Facility was contaminated with TCE and that the ADEQ considered Nucor a responsible party under A.R.S. § 49–283. (Appendix to Component's Comments, exhibit C.)

The proposed settlement agreement addresses Nucor's liability under section 107 of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9607, at the West Central Phoenix WQARF Study Area (the "Study Area"). The Study Area, which includes the Facility, encompasses about ten square miles and is bounded on the north by Campbell Avenue, on the east by 27th Avenue, on the south by McDowell Road, and on the west by 59th Avenue. The State asserts that the contamination found in the Study Area probably occurred over a forty to fifty year period and results from a multitude of companies located at many different facilities. To date, the ADEQ has issued notice letters to nine potentially responsible parties[3] ("PRPs") in the Study Area. (Response to Comments, exhibit C at 3.) The State asserts that it is in the process of preparing notice letters to additional PRPs.

Furthermore, Nucor is but one of several companies that manufactured electronic components at the Facility. Other manufacturers include United Industrial Corporation, Components, and Corning Glass Works.[4] (Response to Comments, exhibit B(2).) The Facility subsequently was divided into three parcels which currently are owned by the Trust; Perry, Inc.; and Charles May. (Id.)

## II. CONTENTS OF THE PROPOSED SETTLEMENT AGREEMENT

The proposed settlement agreement ("Agreement") asserts four purposes: (1) to protect the public health, welfare and the environment from alleged releases and threatened releases of hazardous substances from the Facility, (2) to provide the State with funding for investigative, response, removal and remedial actions to protect the public from alleged releases or threatened releases of hazardous substances from the Facility and Study Area, (3) to provide the State with funding to take any appropriate actions necessary to protect and restore the natural resources damaged by releases of hazardous substances from the Facility and Study Area, and (4) to resolve fully and finally Nucor's liability for costs incurred by the State or by other persons from any soil or groundwater contamination related to the Facility or the Study Area. (Proposed Agreement at 6.) The Agreement specifically provides that it is the intent of the parties that "upon Nucor's fulfillment of its obligation ... Nucor will have no liability whatsoever to any Person for any claims or causes of action arising out of or relating to its ownership or operation of the Facility." (Id.)

Nucor agrees to pay to the State $1,275,000.00 and to provide the State with full access to all factual or technical materials and data and legal research it has acquired in connection with the alleged contamination of the Study Area. (Id. at 12–13.) Nucor further agrees to provide legal and investigative assistance to the State for a reasonable period of time following execution of the Agree-

---

**2.** Throughout this order, the court uses the terms "the State" and "ADEQ" interchangeably.

**3.** Components asserts that the nine PRPs are Nucor, Components, United Industrial Corporation, F & B Manufacturing, Inc., the Milado Filco Anderson Trust, Layke Incorporated, Lansdale Semiconductors, the Pincus Family Trust, and Charles May.

**4.** The State and Nucor assert that Components is a wholly owned corporate subsidiary of Corning,

Incorporated ("Corning"). Movants further contend that Components is an empty shell corporation with no assets. While the State insists on negotiating with Corning and not Components, Corning allegedly refuses to acknowledge any direct responsibility for the contamination. (Response to Comments at 2, n. 1.) By referring only to Components, and not Corning, in this order, the court does not imply that it has resolved this dispute.

·ment. (*Id.* at 13.) The State acknowledges that Nucor's proposed payment "is a fair and reasonable settlement of disputed claims under all the circumstances" and that execution of the Agreement is in the public interest. (*Id.* at 14–15.)

·In exchange, the State covenants ,not to sue and releases Nucor from all claims relating to the Study Area which the State currently has or may have in the future, and from all liability, costs, losses, or damages which the State has sustained or may incur in the future from the Study Area. (*Id.* at 13–14.) Pursuant to CERCLA section 113, 42 U.S.C. § 9613, the State also grants Nucor protection from all persons for all contribution claims relating to ·the Facility or Study Area. (*Id.* at 15–17.) The Agreement further provides that the contribution protection shall apply not only to section 113 contribution claims, 42 U.S.C. § 9613, but also to section 107 direct claims, 42 U.S.C. § 9607, and to non-CERCLA claims which seek substantially similar relief. (*Id.* at 16.) Under the Agreement, Nucor retains the right to seek contribution or indemnification from all persons who are not signatories to the Agreement. (*Id.* at 17.) The State "expressly represents" that the Agreement is the ·result of arms-length negotiations, is a ,fair settlement of Nucor's alleged liability, and is in the public interest. (*Id.* at 16.)

Finally, the Agreement includes a non-severability clause which provides that if the court does not approve the Agreement in the exact form submitted to the court, the entire Agreement shall be declared null and void. (*Id.* at 20–21.)

## III.  ANALYSIS

Comments to the proposed Agreement can be categorized into three arguments. First, the court lacks sufficient and reliable technical information to determine whether the Agreement is adequate, fair, reasonable, and consistent with the purposes of CERCLA. Second, the settlement process procedurally was unfair. Third, the scope of liability protection granted by the State to Nucor is overbroad and exceeds the protection permitted under CERCLA.

Prior to approving a proposed CERCLA settlement agreement, the court must find that the settlement is procedurally fair, substantively fair, reasonable, and consistent with the ·objectives of CERCLA. *United States v. Cannons Engineering Corp.,* 899 F.2d 79, 84–86 (1st Cir.1990); *City of New York v. Exxon Corp,* 697 F.Supp. 677, 692 (S.D.N.Y.1988). The State argues that the court should grant it great deference in determining whether the proposed settlement is fair, reasonable, and consistent with CERCLA. The court, however, agrees with the First Circuit that the "true measure of the deference due depends on the persuasive power of the agency's proposal and rationale, given whatever practical considerations may impinge and the full panoply of the attendant circumstances." *Cannons,* 899 F.2d at 84. Thus, the court will not conduct a *de novo* review of the merits of the proposed settlement, but neither will it "mechanistically rubberstamp" the Agreement. ,*See Cannons,* 899 F.2d at 84.

### ·  A.  *Procedural Fairness*

Components and Highland [5] argue that the settlement process between the State and Nucor procedurally was unfair. When considering the procedural fairness of the agreement, the court must look to the negotiation process and "attempt to gauge its candor, openness, and bargaining balance." *Id.*

Components asserts that ADEQ negotiated with Nucor in secret and offered it vastly different terms than were made available to other PRPs. Furthermore, Components contends that the ADEQ consistently misled other PRPs about the settlement process and settlement terms and dragged its feet in negotiations with the PRPs as a group. The State responds that it did not drag its feet in negotiations with the PRP group and that it did not mislead anyone. The State does not dispute that it privately met with Nucor, but argues that this behavior was not inappropriate. The State also argues that it was entitled to offer different terms to Nucor based

---

**5.** In its supplemental comments, Highland incor-   porated the comments of Components.

on Nucor's history of cooperation and its status as the first PRP to settle.

The State and Nucor contend that they began discussions in 1989 and that Nucor had expressed an early interest in settling. The State's need to develop further information at that time, however, apparently precluded settlement negotiations at that time. In the late fall of 1990, the State indicated its desire to negotiate with all PRPs as a group. In January, 1991, Nucor allegedly attempted to meet with the State to tender a settlement offer prior to any group meetings. The State and Nucor agreed to defer this meeting until such time as the State determined that the group negotiations were absolutely useless.

On January 9, 1991, the State presented the PRP group with a draft consent decree and negotiations between the State and the PRP group followed.[6] The State contends that during the first meeting on January 22, 1991, it informed the group that it had prepared a reasonable and fair settlement agreement and had no desire to engage in negotiations where the parties begin at extreme positions. The State allegedly also indicated that group negotiations would be limited to ninety days, and that "it would not consider individual settlement offers or *de minimis* cash-out proposals for a ninety day period unless or until it appeared that the group negotiations would not result in a group settlement." (Response to Comments at 40.) Components' attorney recalls that at this meeting the State explained that it "would not consider *de minimis* or cash-out settlements, that [the State] would negotiate only with a PRP group, and that the period for negotiations was limited to 90 days." (Components' Comments at 18.)

On March 28, 1991, after several meetings, the State received the PRP group's revisions to the State's draft consent decree. The State asserts that the group's revisions gutted the draft consent decree and that at that time the State concluded that the PRP group was not being reasonable and that the negotiation process had failed. After so concluding, the State allegedly informed Nucor that it would entertain Nucor's settlement offer.

The State, however, continued to negotiate with the PRP group and on May 23, 1991, the State delivered to the PRP group a take-it-or-leave-it proposed consent decree. Components asserts that the State never stated that the negotiations were futile or that it would entertain individual settlement offers. The State implies that Components should have realized that the State considered negotiations futile by its take-it-or-leave-it offer and by its May 24, 1991 letter to the negotiating group which provides:

The best interests of your clients and the best interests of the public health, welfare and environment, as determined by ADEQ, are so substantially far apart that the chasm cannot be breached.

(State's Response to Supplemental Comments at 35.) By June 28, the final acceptance date, no one from the PRP group had indicated to the State a willingness to sign the decree as presented. The State subsequently filed this complaint and joint motion on July 5, 1991.[7]

First, the court finds no evidence that the State "dragged its feet" during its negotiations with the PRP group. The fact that the State may have extended the negotiation period and internal deadlines does not prove that the State was intentionally delaying the group negotiating process. Furthermore, the court finds no reason for the State to delay its negotiations with the PRP group. It appears to the court that the State had an interest in negotiating both the Nucor Agree-

---

6. According to the State, it invited twelve entities to participate in these negotiations: Corning; Nucor; United Industrial; Layke; F & B Manufacturing; Lansdale Semiconductor; the Lenore U. Pincus Family Trust, the Milado Filco Anderson Trust; A.W and Doris J. Canfield; May Industries, Charles G. May, and Eugene R. Perri.

7. The State asserts that had a group of PRPs chosen to enter the settlement, the State could have backed out of the Nucor Agreement pursuant to paragraph XVI. Paragraph XVI, however, merely provides that the State may withdraw from the Agreement "if comments received [during the public comment period] disclose facts or considerations which reasonably indicate that this Agreement is inappropriate, improper or inadequate."

ment and the PRP group agreement. The negotiation and approval of one agreement would not necessarily preclude the beneficial effects of the other agreement. The PRP group agreement covered funding for soil remediation and drilling of monitor wells, while the Nucor Agreement concerned a cash-out settlement in which the State could allocate the money for any task or action related to the Study Area.

Furthermore, Components provides no evidence that Nucor or the State attempted to sabotage or undermine the group negotiating process to secure approval of the Nucor Agreement. Rather, it appears to the court as though the two negotiating processes were discrete processes which overlapped somewhat in time.

■ Second, the court similarly finds no fault in the State conducting private negotiations with Nucor, unknown to the other PRPs. The ADEQ is free to negotiate and settle with any PRP it chooses, so long as the ADEQ operates in good faith. *Cannons*, 899 F.2d at 93. The State need not open its negotiations to all PRPs and need not "telegraph its settlement offers, divulge its negotiating strategy in advance, or surrender the normal prerogatives of strategic flexibility." *Cannons*, 899 F.2d at 93.

■ The court also finds that the State was entitled to treat Nucor differently from Components or Highland. The State's relationship with Components and Highland was very different from that with Nucor. The state contends that Nucor has cooperated with the State since 1988 and has incurred costs and expenses in excess of $700,000.00 while assisting the State in identifying and establishing responsibility for the alleged contamination at the Study Area. In contrast, Highland failed to respond to an ADEQ hazardous waste questionnaire in 1988 and allegedly has not performed any studies regarding the Study Area. Unlike Nucor, neither Highland nor Components had attempted to negotiate a settlement agreement with the State prior to the group negotiations. Furthermore, neither Components nor Nucor attempted to initiate any private negotiations with the state after receipt of the May 24, 1991 letter.

■ The court is concerned, however, that the State may have misled the PRP group regarding the State's willingness to entertain settlement offers while negotiating with the PRPs as a group. Even assuming the State's interpretation of its position, the State asserted that it would not consider "individual settlement offers" for ninety days unless it appeared that the group negotiations would fail. As of March 28, 1991, when the State apparently concluded that the group negotiations were futile and began private negotiations with Nucor, the State had neither terminated negotiations with the group nor directly communicated its belief that continued negotiations with the group were futile. The group had no real notice of the State's changed position until the State issued its May 24, 1991 letter to the PRP group.

While the State may have misled the combined PRP group, the State did not mislead either Components or Highland. Highland, who alleges that at most they are a *de minimis* party, apparently was not even invited to participate in the PRP group negotiations. Furthermore, the State invited Corning, not Components, to participate in the PRP group negotiations. The State asserts, and Components does not dispute, that the State had communicated clearly that it had no intention of negotiating with Components, an allegedly assetless "empty shell corporation." Corning, however, refused to participate in the group negotiations and instead a representative from Components participated. Finally, the fact that none of the other PRP negotiating group members has objected to the settlement on this grounds is evidence that the Agreement is procedurally fair. *See Exxon Corp.*, 697 F.Supp. at 694.

In light of the above, the court finds insufficient evidence to support Components' assertion that the Nucor Agreement is procedurally unfair.

**B. *Substantive Fairness***

■ The substantive fairness of the Agreement concerns the issues of corrective justice and accountability. *Cannons*, 899 F.2d at 87. Settlement terms must be based

on an acceptable measure of comparative fault which apportions liability according to "rational (if necessarily imprecise) estimates of how much harm each PRP has done." *Id.* The court's role, however, is not to determine the best method for measuring fault and apportioning liability, but rather to uphold the method proposed by the ADEQ unless it is "arbitrary, capricious, and devoid of a rational basis." *Id.*

All of the three entities commenting on the Agreement asserted that the court lacked sufficient technical data to determine whether the Agreement was substantively fair. The Trust did not ask the court to disapprove of the Agreement, but requested that the court delay approval until the State provided the court with sufficient technical information upon which to analyze the Agreement. Highland requested thirty to sixty days in which to conduct additional testing and the opportunity to file further comments depending on test results. Components argued that vital technical information was lacking which precluded court approval of the Agreement.

In response to these comments, the State supplied additional technical information to both the court and commenting parties. The Trust did not submit additional comments to the court. Highland and Components submitted supplemental comments, in which they maintained that the court still lacked sufficient technical information upon which to base its decision.[8] Both the State and Nucor responded to these supplemental comments and the State provided the court with additional technical information.

Components and Highland essentially argue that the information submitted by the State is inadequate in three respects. First, the State has no reliable estimate of the total cost for remediating contamination at the Study Area. Second, the State lacks sufficient information to determine the proportional fault and liability of Nucor as compared to the other PRPs. Third, the State has not conducted a remedial investigation ("RI") or feasibility study ("FS").

## 1. Estimated Cost of Clean-Up at the Study Area

Contamination at the Study area was initially discovered in 1982. Since 1984, the State has conducted over fifty preliminary assessments and site investigations regarding this contamination. Ana I. Vargas, the ADEQ project manager for the Study Area, attests that the State has substantial knowledge regarding the conditions and nature of contamination at the Study Area. (Response to Comments, exhibit C.) Vargas attests that the State has extensive water quality data regarding the Study Area and the results of soil gas analyses or soil sampling for more than fifteen facilities located within the Study Area. (*Id.*) According to Vargas, the State has received hundreds of responses to hazardous waste questionnaires, has an aerial photo history of the Study Area, and has detailed information regarding property ownership, manufacturing processes, and chemical usage and/or disposal practices for hundreds of facilities in the Study Area. (*Id.*)

In 1987, the State allegedly hired a consulting firm, The Earth Technology Corporation ("Earth Technology"), to conduct a preliminary RI to assess the potential sources, extent, and severity of contaminants detected in groundwater in the Study Area. Furthermore, prior to entering into this Agreement with Nucor, the state requested Earth Technology to develop a reasonable cost estimate for remediation of the soils and groundwater for the Facility. (Response to Comments, exhibit E.) Allegedly, Earth Technology complied with this request, submitted a verbal summary of their conclusions to the ADEQ on June 11, 1991, and followed up with a written report on September 19, 1991. (*Id.*)

Earth Technology prepared their estimate of clean up costs at the Study Area through comparison with a federal superfund site, the Phoenix Goodyear Airport ("PGA"). Earth Technology first determined that physical site characteristics of the Study Area were similar to those of the PGA. Using a conservative, or worst case, approach, Earth Technology then extrapolated costs for the Study Area from extensive studies conducted at

---

**8.** To the court's knowledge, Highland did not conduct any testing.

PGA and concluded that about $22 million was required to clean up contamination at the Study Area.

Components argues that the estimate by Earth Technology is not reliable because it is not based on a scientific determination of contamination in the Study Area. Components notes that the cost estimate for the PGA site has a margin of error of plus 50 percent and minus 30 percent and that the margin of error for the cost estimate for the Study Area therefore is even higher. Components asserts that the estimate only applies to contamination at the Facility and not the Study Area.

Finally, Components asserts that the estimate by Earth Technology is nothing more than a last minute justification for the previously approved Agreement between the State and Nucor. In support of its argument, Components refers the court to an affidavit by a senior engineer and project coordinator of Conestoga–Rovers and Associates ("CRA"), an environmental consulting firm, who asserts that the Earth Technology cost estimate is only a guess which should not be relied upon. (Components' Supplemental Comments, exhibit A at 5.)

The State asserts that the estimate is reasonable because both sites (1) contain the same contaminants, primarily TCE, (2) have similar lithology and hydrogeology, (3) similar areal extent of contamination, and (4) would use the same treatment method, "pump and treat." The State further notes that the level of contaminants at the PGA site, 350,000 ppm, far exceeds the highest potential level in the Study Area, 6,000 ppm. Nucor asserts that the pump and treat method is the most expensive alternative used for groundwater clean up. Both the State and Nucor assert that uncertainty in estimating cleanup costs is unavoidable, as shown by the large margin of error in the PGA cost estimate which was developed after completion of a formal RI/FS study which took about eight years and cost over $4.1 million. Nu-

cor and the State also note that Earth Technology used a worst case approach in extrapolating costs.

Nucor asserts that the areal scope covered in Earth Technology's estimate is appropriate because it covers the entire plume of contamination attributable to the Facility, including off-site contamination. The State also explains that the areal extent of the study was about one square mile, or 640 acres, the area of contamination which exceeded federal drinking standards.[9]

▬ Finally, the court notes that, contrary to the CRA engineer, ADEQ's engineer and project manager for the Study Area, Ana Vargas, and Earth Technology conclude that the cost estimate is reasonable. The court has no desire to resolve the differences of experts regarding the technical adequacy of Earth Technology's cost estimate. Nor would it be appropriate for the court to do so. The ADEQ and their environmental consultant who has worked on the Study Area since 1987 believe that the cost estimate is reasonable. The court finds no reason to believe that the estimate is unreasonably uncertain or technically inadequate.

## 2. Determination of Nucor's Liability

In determining Nucor's proportional liability for the estimated $22,278,000 clean up costs, the State compared indexed sales data for the three pre–1976 operators at the Facility. Based on these data, the State concluded that Nucor was liable for 8.1 percent of estimated remedial costs.[10] The State asserted that the tangible benefits of the Agreement to the State totalled about $2.075 million, or about 9.3 percent of total costs: an immediate cash payment of $1.275 million, access to factual and technical information and legal research concerning the Study Area valued at $700,000, and continued assistance worth about $100,000. The State also asserted that it received numerous intangible

---

9. The State asserts that while contamination has been found in a three square mile area, the level of contamination exceeds federal drinking standards in only a one square mile area.

10. Assuming that the pre–1976 operators are completely responsible for contamination at the Study Area, an assumption which the State disputes, the indexed sales data apportions liability as follows: Corning/Components, 89.2%; Nucor, 8.1%; and United Industries Corporation, 2.7%.

benefits from this settlement including encouraging the regulated community to cooperate with the State, encouraging parties to enter serious settlement agreements, and providing immediate funds which the State may use to fund remediation or commence litigation against other PRPs.

The State asserts that indexed sales are a reasonable method for determining proportional liability in this case because the pre–1976 operators have no records detailing the quantities of hazardous substances purchased or disposed. Furthermore, the State asserts that the preponderance of evidence suggests that the production processes, types of chemicals used in the processes, and disposal methods did not change in the pre–1976 operators.

Components argues that using sales data to apportion liability for contamination is an improper method because sales data say nothing about the real issue, waste disposal methods. Components asserts that courts never rely on sales data and attaches affidavits from CRA employees who assert that they have never seen a court use this method. (Components' Supplemental Comments, exhibit A.) Components argues that waste disposal methods did change among the pre–1976 operators and refers the court to an internal ADEQ memo and interviews with a person who worked at the Facility from 1958 to 1972 in support of this assertion. (Components' Supplemental Comments, exhibits E, F, G.) Specifically, Components presents evidence that Components/Corning began recycling its hazardous wastes and dumping them into the city sewer system in lieu of dumping them into septic tanks and various setting ponds.

The State counters that because of the passage of time and the lack of any documents to establish the amount of chemical usage or disposal, the comparison of sales data is a reasonable method to apportion liability. The State asserts that it cannot use the volumetric method because there are no records to establish the amount of chemical usage or disposal. Further, the State may not apportion liability based on different lev-

els of toxicity because all of the PRPs allegedly used the same chemical, TCE.

The State contends that the witness relied upon by Components is not credible because at the time he was interviewed he was bedridden, dying, on strong pain medication and oxygen, and asserted that he had a short memory. The State also notes that this same witness later denied he had any knowledge of TCE use or disposal. (Response to Supplemental Comments, exhibit E.)

The State refers the court to interviews with other previous employees who assert that Components/Corning disposed of TCE in a variety of methods including down injection wells and on the ground. (Response to Supplemental Comments, exhibit F.) The State contends that the Facility had a complex plumbing system with numerous drains, pipes, and waste streams, and that connection to the city sewer system does not necessarily indicate that disposal into septic tanks was discontinued. Rather, investigations by the State allegedly revealed that the septic tanks were not capped until 1982. (Response to Supplemental Comments, exhibit G.) Furthermore, the State asserts that Components/Corning constructed new gravel pits in 1967, an activity that would be a waste of money if the TCE was disposed only into the city sewer system or recycled.[11] The State further asserts that the relative costs of recycling TCE and purchasing virgin TCE in the mid–1970s, plus the absence of knowledge concerning environmental concerns, shows that businesses had little economic incentive to recycle.

██ Without conducting an independent analysis of the evidence, the court notes that the State clearly has sufficient evidence to conclude that methods of production and chemical disposal did not change among the three pre–1976 operators. In light of this conclusion, coupled with the complete lack of evidence documenting actual chemical usage and disposal, the State's indexed sales method is not arbitrary, capricious, or devoid of a rational basis.

Components also asserts that the sales data used by the State to represent Compo-

---

11. Apparently, the septic tanks were connected with the gravel pits.

nents' sales is inaccurate and proposes its own sales figures. Recalculation of Components' liability using figures presented by Components, however, only increases Nucor's share of liability from 8.1 percent to 8.97 percent, still below the State's value of the Agreement at 9.3 percent of estimated costs. Thus, this argument does not require the court to reach a different conclusion.

The court also notes that the estimate of Nucor's liability is conservative. The liability of the three pre–1976 operators of the Facility, including Nucor, is based on the assumption that only these three operators contributed to contamination at the Study Area. The State asserts that this assumption is incorrect for two reasons. First, the State believes that post–1975 operators also contributed to the contamination. Second, the state believes that facilities in the Study Area besides the "Facility" also contributed to contamination at the Study Area.

█ The court concludes that the indexed sales method is reasonable and that the court has sufficient information upon which to determine if the Agreement is substantively fair. After review of the evidence, the court concludes that the Agreement is substantively fair. In reaching this conclusion, the court considered both the tangible and intangible benefits asserted by the State, including Nucor's long history of cooperation with the state and its status as the first party to settle with the State. *See United States v. R.W. Meyer, Inc.*, 932 F.2d 568, 573 (6th Cir.1991) (when apportioning liability under CERCLA, trial court did not abuse its discretion in considering equitable factors such as the level of cooperation with the EPA); *Cannons*, 899 F.2d at 89 ("rewarding PRPs who settle sooner rather than later is completely consonant with CERCLA's makeup").

### 3. Need for a formal RI/FS study

█ Components and Highland argue that the court should not approve the Agreement because the State has not completed a formal RI/FS study. Components asserts that under 42 U.S.C. § 9622(e)(3)(A),[12] the EPA is constrained from promoting settlements until after completion of a formal RI/FS study. Components argues that, consistent with this section, the court should not approve this Agreement until the State completes an RI/FS.

The State argues that the restriction in 42 U.S.C. § 9622(e)(3)(A) applies only to the development of nonbinding allocations of responsibility, which is not applicable in this case. Furthermore, the State contends that CERCLA contains no prohibition on cash out settlements in the absence of an RI. Rather, the State asserts that EPA rules specifically permit cash out settlements at any stage of the remedial process.

The State argues that an obligation to conduct RI/FS studies may exist before promoting settlements which select a remedy, however, this obligation does not extend to cash out settlements which do not specify remedies. Rather, the State contends that cash out settlements are entitled to less court scrutiny than cleanup agreements.

Nucor argues that considering the State's limited financial situation and the failure of any PRP to agree to complete a full formal RI/FS, the State has two options. It can either accept a cash out settlement which will generate funds for an RI/FS, or it can pursue litigation. If the State pursues litigation, delay of remedial work necessarily will result and the litigation will end in an apportionment of liability without the benefit of an RI/FS. Thus, Nucor concludes that the apportionment of liability without the benefit of an RI/FS is the inevitable consequence of Components' argument.

Both Nucor and the State refer the court to a district court case which permitted a cash out settlement with a non *de minimis* PRP prior to completion of a formal RI/FS. *United States v. Vertac Chemical Corp.*, 756

---

**12.** Section 9622(e)(3)(A) provides:

The President shall develop guidelines for preparing nonbinding preliminary allocations of responsibility.... When it would expedite settlements under this section and remedial action, the President may, after completion of the remedial investigation and feasibility study, provide a nonbinding preliminary allocation of responsibility which allocates percentages of the total cost of response among potentially responsible parties at the facility.

42 U.S.C. § 9622(e)(3)(A).

F.Supp. 1215 (E.D.Ark.1991), *aff'd sub nom. United States v. Hercules, Inc.,* 961 F.2d 796 (8th Cir.1992). In *Vertac,* the district court specifically rejected the argument that 42 U.S.C. § 9622 prohibited a cash out settlement with a non *de minimis* PRP. *Id.* at 1218–19. The Eighth Circuit affirmed, holding that sub-sections (a) through (f) of CERCLA section 122, 42 U.S.C. § 9622(a–f), refer to agreements for actual remedial action as opposed to cash out agreements. *Hercules,* 961 F.2d at 799.

Components presents no case law or statutory authority requiring this court to reject the Agreement because the State has not completed an RI/FS. The State and Nucor, however, refer the court to case law and EPA rules which permit cash out settlements at any stage of the remedial process. *See Superfund Program; Mixed Funding Settlements,* 53 Fed.Reg. 8279, 8283 (March 14, 1988).

Completion of an RI/FS undoubtedly would reduce the uncertainty regarding the total clean up cost at the Study Area and possibly could reduce uncertainty regarding the proportional fault of the PRPs. Uncertainty, however, is inevitable even with an RI/FS. The State currently has limited funds available to conduct an RI/FS.[13] If the PGA study is representative of the Study Area, completion of a formal RI/FS may take as long as eight years to complete. The State must weigh these factors and reach a balance which it considers in the public interest. Even though a formal RI/FS has not been completed, the State believes that it has sufficient information to rationally apportion Nucor's liability. The court has found no reason to discredit this belief. Forcing the State to complete a formal RI/FS before negotiating any settlement agreement conceivably could preclude all agreements, a result contrary to CERCLA objectives. Thus, the court rejects Components' argument.

**13.** Nucor asserts that the state's resources for sites such as the Study Area are limited to about $5 million per year.

**14.** The Agreement provides that "Nucor shall retain all rights under statutory or common law

### 4. Contribution Protection

The Trust also voices concerns that the Agreement protects Nucor from contribution claims while permitting Nucor to assert such claims against others.[14] The Trust argues that, to be fair, the settlement at a minimum should require Nucor to forego any and all contribution claims that it might have against the Trust.

■ In passing the SARA amendments to CERCLA, Congress expressly created a statutory scheme which exposes nonsettling parties to the risk of disproportionate liability. *Cannons,* 899 F.2d at 91. Section 113(f)(2) of CERCLA expressly grants contribution protection to settling parties and provides:

A person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement.

42 U.S.C. § 9613(f)(2). The statute clearly mandates that a settling party *shall not be liable* for related contribution claims. Thus, the contribution protection afforded Nucor in the Agreement is not only appropriate, but is mandated by CERCLA.

Furthermore, section 113(f)(3)(B) provides:

A person who has resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement may seek contribution from any person who is not a party to a settlement referred to in paragraph (2).

42 U.S.C. § 9613(f)(3)(B).

■ In light of these two statutory provisions, the court cannot find the Agreement inherently unfair merely because the State, in accordance with CERCLA, provided Nucor contribution protection while not requiring Nucor to forego its contribution claims.

to seek contribution or indemnification from and against any and all Persons who are not signatories to this Agreement." (Proposed Agreement ¶ X(F).)

The risk of disproportionate liability is an integral part of CERCLA. *Cannons,* 899 F.2d at 92. In fashioning the Agreement as a whole, the State apparently chose not to foreclose Nucor's contribution claims. Having determined that the State has rationally determined Nucor's proportional liability, this court will not second guess the State's negotiating decision regarding contribution claims.

### C. *Reasonableness*

■ Before approving the Agreement, the court must find that the Agreement is reasonable. In considering the reasonableness of the Agreement, the court will consider both the efficacy of the settlement in compensating the public for actual and anticipated remedial and response costs and the relative strength of the parties' litigating positions. *Id.* at 89–90. The court's role is not to determine whether the Agreement is the best possible settlement that the State could have achieved, but rather whether the settlement is "within the reaches of the public interest." *Exxon Corp.,* 697 F.Supp. at 693 (quoting *United States v. Carrols Development Corp.,* 454 F.Supp. 1215, 1222 (N.D.N.Y.1978)).

Opponents of the Agreement argue that the Agreement is not reasonable because an inadequate cash payment by Nucor and associated release of liability could result in a monetary shortfall which the public must satisfy. The State asserts that the public will not incur clean up costs: There are eight other PRPs, including Corning/Components with a net worth of $1,931,000,000, United Industrials Corporation with an alleged net worth of $102,000,000, and F & B Manufacturing with a net worth of $15,600,000. The State asserts that CERCLA liability is joint and several if the harm is indivisible as in the Study Area.

Components also asserts that judicial rejection of the Agreement will not impede the clean up process as Components is already conducting the RI, which must be completed before the remedial process may begin. The State counters that Components is not conducting a formal RI, but merely one phase of an RI. Furthermore, the State contends

that failure to approve the Agreement will delay completion of the RI because of the State's limited funds.

This action was initiated recently to secure approval of the proposed Agreement. The parties have conducted little or no discovery to date. Neither the parties nor the commenting entities address the relative strengths of the parties. Thus, the court has no evidence before it to determine the relative litigating strengths of the involved entities. The court does note, however, that the State has limited funds available for litigation purposes.

The ADEQ, the agency charged with acting in the public interest, finds that the public interest is best served through entry of this agreement. The court find no reason to dispute this belief. Even if the State has underestimated the total cost of clean up and Nucor's proportional fault, the remaining PRPs appear to have sufficient assets to bear the costs of cleaning up the Study Area. Furthermore, while the State may have a strong substantive position for litigation, it is nevertheless disadvantaged by limited funds. Thus, the court concludes that the Agreement is reasonable and in the best interest of the public.

### D. *Consistency with Objectives of CERCLA*

Finally, the Agreement must be consistent with the "overarching principles [of CERCLA]: accountability, the desirability of an unsullied environment, and promptness of response activities." *Cannons,* 899 F.2d at 90. As evidenced by the contribution protection clause previously discussed, CERCLA is designed to favor settlements over litigation. *Cannons,* 899 F.2d at 92.

Accomplishment of one CERCLA goal does not necessarily promote the accomplishment of the other goals. For example, delaying settlement agreements until an agency can precisely determine accountability necessarily runs counter to the achievement of a "prompt" response. Obviously, the agency charged with protecting the environment has to balance these sometimes conflicting goals to reach a balance which best protects and

preserves public health and the environment. In this case, the ADEQ has opted to enter an early settlement agreement with Nucor and thus preclude expensive and time consuming litigation even though the State admittedly lacks precise information regarding accountability.

The court has determined that the State has provided a reasonable cost estimate for cleaning up the Study Area and has used a rational method to apportion liability among the alleged major contributing PRPs. In light of CERCLA's preference for settlements over litigation, this court finds that, on balance, the Agreement is consistent with the objectives of CERCLA.

### E. *Scope of Liability Protection*

The proposed Agreement provides:

Contribution protection under this Paragraph X shall apply to CERCLA claims by any Person under CERCLA sections 107 or 113, 42 U.S.C. §§ 9607 or 9613, and to non-CERCLA claims seeking, under other theories, substantially similar relief.

(Proposed Agreement, § XIX, ¶ D.) Components and Highland argue that the court should reject the proposed Agreement because CERCLA section 113(f)(2) authorizes to a settling party protection only from true derivative contribution claims under section 113 and not from direct claims under section 107.[15] Components is willing to withdraw this objection if the State and Nucor amend the Agreement to assert that the Agreement confers nothing more than contribution protection as authorized by section 113(f).

Both Nucor and the State argue that the court need not resolve this issue before approving the Agreement. Rather, the State argues that the court should defer this issue until Components asserts a direct section 107 claim against Nucor and Nucor moves to dismiss pursuant to its contribution protection under section 113(f)(2). Furthermore, both the State and Nucor agree with Compo-

nents that the State can not grant contribution protection greater than that permitted under CERCLA section 113(f)(2).

Thus, the court finds no need at this point to address this issue. The court does note, however, that the consent decree provides only the maximum amount of contribution protection to Nucor permitted under CERCLA section 113(f)(2).

### III. CONCLUSION

For the previously discussed reasons, the court finds the proposed Agreement between the State and Nucor to be procedurally fair, substantively fair, reasonable, and consistent with the objectives of CERCLA. Furthermore, the court notes that the Agreement provides Nucor only with the maximum amount of contribution protection permitted under CERCLA section 113(f)(2). At this time, the court does not determine whether Components' claim against Nucor is precluded by the Agreement.

IT IS ORDERED granting the Joint Motion for Entry of Settlement Agreement Between Plaintiff State of Arizona and Defendant Nucor Corporation (Doc. 2).

---

**15.** Section 107 provides:
   Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section ... any person who at the time of disposal of any hazardous substance owned or operated any facility at

which such hazardous substances were disposed of ... shall be liable for ... any other necessary costs of response incurred by any other person consistent with the national contingency plan.
42 U.S.C. § 9607(a)(2)(B) (1992).