**55 MOTOR AVENUE COMPANY, et al., Plaintiff**

v.

**LIBERTY INDUSTRIAL FINISHING CORP., et al., Defendants.**

Coltec Industries, Inc., et al., Third–Party Plaintiffs

v.

Beazer East, Inc., et al., Third–Party Defendants

United States of America, Plaintiff,

v.

Coltec Industries, Inc., Goodrich Corporation, 55 Motor Avenue LLC, Cubbies Properties, Inc., Jefry Rosmarin, J. Jay Tanenbaum, Jan Burman, Jerome Lazarus, Liberty Associates, William Heller, Koch–Glitsch, LP, Beazer East, Inc., Defendants.

Nos. CV–91–968 (NGG)(JML), CV–04–1308 (NGG)(RML).

United States District Court, E.D. New York.

Aug. 27, 2004.

■■■■■■■■■■■■■■■■

George J. Weiner, Dyer, Ellis & Joseph, Mary Beth Bosco, John C. Martin, Parker E. Brugge, Patton Boggs, L.L.P., Washington, DC, Ava A. Harter, Thompson, Hine & Flory, LLP, Cleaveland, OH, David E. Nash, Michael L. Hardy, Thompson, Hine & Flory, LLP, Cleveland, OH, for Plaintiff.

John A. Harras, Morton Weber and Associates, Melville, NY, Daniel Reisel, Charles E. Merrill, Eric Bregman, Sive, Paget & Riesel, P.C., Avraham C. Moskowitz, Moskowitz & Book, LLP, New York, NY, James F. Monafo, Amichael H. Wetmore, Charles E. Merrill, David R. Dyroff, Jr., Husch & Eppenberger, St. Louis, MO, Stanley Alpert, Brooklyn, NY, Joseph J. Zedrosser, Breed, Abbott & Morgan, New York, NY, George J. Weiner, McCutchen, Doyle, Brown & Enersen, L.L.P., Washington, DC, Deborah E. Lans, Donald H. Chase, Morrison, Cohen, Singer & Weinstein, LLP, New York, NY, John E. Frey, Wildman, Harrold, Allen & Dixon, Chicago, IL, Mark D. Shepard, Babst, Calland, Clements & Zomnir, P.C., Pittsburgh, PA, Laura J. Kozma, Cohen, Shapiro, Polisher, Shiekman and Cohen Princeton Pike Corporate Center, Lawrenceville, NJ, Robert J. Knapp, Witchita, KS, Allan J. Topol, Ellen P. Goodman, Karen A. Ballotta, Neil K. Roman, Covington & Burling, Washington, DC, Robert P. Knapp, III, Wingate & Cullen, Melville, NY, Margaret Mary Surowka, McNamee, Lochner, Titus & Williams, P.C., Albany, NY, James P. Rigano, Fischbein Badillo Wagner Harding, Melville, NY, Michael Craig Schmidt, McMillan, Rather, Bennett & Rigano, P.C., Melville, NY, George J. Weiner, Dyer, Ellis & Joseph, Washington, DC, for Defendants.

*Memorandum and Order*

GARAUFIS, District Judge.

In these two actions under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), a number of parties have asserted claims for liability, contribution, and indemnification for removing hazardous substances from an industrial park in Farmingdale, New York. At this time, the court considers a proposed consent judgment that will constitute a final disposition of nearly all of the claims in the above-captioned actions. Although the settlement was filed under the caption of *United States v. Coltec, et al.,* CV–04–1308, because the proposed settlement agreement will settle claims in both above-captioned actions, these two cases are consolidated for purposes of this Memorandum and Order only. *See* Fed. R.Civ.P. 42(a) ("When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all of the matters in issue in the actions; it may order the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay"). There have been no objections to the proposed settlement agreement. For the reasons discussed below, the motion to enter the Consent Judgment is granted.

## I. BACKGROUND

The Liberty Industrial Finishing Superfund Site ("Site") is located at 55 Motor Avenue in Farmingdale, New York; it encompasses approximately thirty acres as well as nearby areas where hazardous substances have been released from the Site. *See* Complaint ("Comp.") at ¶¶ 1, 2. The Site is adjacent to roads, a municipal park,

and property owned by the South Farmingdale Water District. Record of Decision, Liberty Industrial Finishing Superfund Site, dated March 28, 2002 ("ROD") at 1. The Water District property contains two deep public water supply wells at a location that is sidegradient to the Site. *Id.* at 1. Further, a sole source aquifer underlying the Site serves as the drinking water supply for 44,000 people, although the groundwater in the vicinity of the Site is not used for the public drinking water supply. *Id.* at 9, 32. The surrounding area is residential and commercial. *Id.* at 1.

Between 1940 and 1957, various entities conducted airplane parts manufacturing, including finishing activities such as electroplating and painting at the Site. Comp. at ¶ 23. As a result of this work, waste containing hazardous substances was disposed of at the Site. *Id.* Also during this period, the federal government developed and maintained production of materials needed for World War II at the Site. ROD at 2. From 1957 to 1984, metal plating and fiberglass product manufacturing were carried out at the Site. Comp. at ¶ 24; *see also* ROD at 2–3. "Throughout most of the period of industrial operation, wastes containing [hazardous materials] were discharged untreated into below-grade sumps, underground leaching chambers, and unlined, inground wastewater disposal basins." ROD at 2. More recently, hazardous materials have been detected in soils, groundwater, sediments, and underground features of the Site. Comp. at ¶¶ 26–27.

Because the proposed Consent Judgment is described in detail in the fifty-one page document (not including exhibits), there is no reason to describe its terms in detail here. *See* Consent Judgment. However, a few key details warrant mentioning. The consent decree provides that the cleanup will consist of a specific $31.8 million remedial plan to remove toxic substances from soil and groundwater from the Site. ROD at 61, 64, and 68. The "major components" of this remedial plan include: a soil remedy including excavation and off-Site disposal of all soils contaminated above groundwater protection levels; a groundwater remedy including collection, treatment and off-site disposal of contaminated ground water; a sediment remedy including excavation and off-Site disposal of contaminated sediments within a pond; institutional controls governing future use of the Site; and restrictions on use of groundwater wells. Government's Memorandum of Law in Support of Motion to Enter Consent Decree ("Gov't Mem.") at 9. A number of private parties, the United States Department of Defense ("DOD") and the United States General Services Administration ("GSA") have all agreed to share the costs of the remedial plan under the consent decree because each has concluded that they are liable under CERCLA. The United States Department of Justice ("Government") estimates that DOD and GSA will pay approximately 40% of the costs of the remedial plan.[1] *Id.* at

---

1. The proposed consent decree provides for DOD and GSA to pay 50% of the "Net funding for the Work and the Features Tasks" and 50% of the "Net Future Response Costs." Consent Judgment at ¶ 58(b). The Consent Judgment defines these costs specifically. *Id.* As a result of deductions, the DOD and GSA are expected to pay only approximately 40% of the cost of the remedial plan. 69 Fed.Reg. 19877 (2004) ("The United States, on behalf of two Settling Federal Agencies, the Department of Defense and the General Services Administration, will pay about 41.5% of the costs to be incurred in performing the remedy, which will amount to between $13.5 million and $17.6 million, depending on total cost of the remedy.")

12. The proposed consent decree provides very substantial stipulated penalties in the event that any of the defendants fails to comply with the requirements of the consent decree. *See* Consent Judgment at ¶¶ 74–85.

The United States Environmental Protection Agency ("EPA") has certified that the proposed remedy meets the requirements for remedial action set forth in 42 U.S.C. § 9621. *See* ROD at 4. The remedial plan will: ensure that groundwater can be used for drinking water; remove Site contaminants that pose a future risk to construction workers; and cleanup a pond on the Site, thus "eliminat[ing] any potential adverse effects to ecological receptors within the Massapequa Creek from exposure to these contaminants." *See* ROD at 2. There is one area of contamination, referred to in the Consent Judgment as "Plume B," that will not be ameliorated by the proposed consent decree. *See* ROD at 18–19. The EPA is still in the process of investigating Plume B. *Id.* The proposed consent decree reserves the Government's right to bring claims against the defendants for liability associated with Plume B. Consent Judgment at ¶ 91(h).

The Government has submitted an affidavit from Lorenzo Thantu, an EPA Remedial Project Manager who has personally visited the Liberty Industrial Finishing Superfund Site. Six sentinel monitoring wells were installed between the Water Districts' drinking water supply well fields and the area known to be contaminated. Thantu Dec. at ¶ 5. These monitoring wells "serve as an early warning system should contamination migrate close to the well fields." *Id.* Thantu states that, to date, this monitoring "has not detected any Site-related contamination" in the monitoring wells. *Id.*

The proposed consent decree was published in the Federal Register on February 14, 2004. *See* Gov't Mem. Appx. at 1; 69 Fed.Reg.19877 (2004). The Massapequa and Farmingdale Water Districts submitted one set of comments and a Farmingdale resident, Chuck W. Gosline, Jr., submitted one set of comments. *See* Gov't Mem. Appx. Exs. A and B.

## II. DISCUSSION

### A. Standard of Review

■ In order to enter a consent decree, "the district court must be certain that the decree (1) 'spring[s] from and serve[s] to resolve a dispute within the court's subject-matter jurisdiction;' (2) 'come[s] within the general scope of the case made by the pleadings,' and (3) 'further[s] the objectives of the law upon which the complaint was based.'" *Kozlowski v. Coughlin,* 871 F.2d 241, 244 (2d Cir.1989) *quoting, Local Number 93, Int'l Ass'n of Firefighters v. City of Cleveland,* 478 U.S. 501, 525, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986); *see also United States v. City of New York,* 30 F.Supp.2d 325, 330–31 (E.D.N.Y.1998) (same).

This court has jurisdiction over the instant dispute pursuant to 28 U.S.C. §§ 1331 and 1345 and 42 U.S.C. §§ 9606, 9607, and 9613(b). Further, the proposed consent decree clearly comes within the scope of the pleadings as it establishes a remedial plan to cleanup the hazardous wastes described in the Complaint. As a result, the first two prongs of the test for approving a consent decree clearly have been met.

■ An analysis of the third factor of this test has come to have more specific meaning in the CERCLA context. "[W]hen reviewing a proposed consent decree in the CERCLA context, a trial court['s] ... function is circumscribed: it must ponder the proposal only to the extent needed to 'satisfy itself that the settle-

ment is [1] reasonable, [2] fair, and [3] consistent with the purposes that CERCLA is intended to serve.'" *United States v. DiBiase*, 45 F.3d 541, 543 (1st Cir.1995), quoting, *United States v. Cannons Engineering Corp.*, 899 F.2d 79, 85 (1st Cir. 1990); *see also City of New York v. Exxon Corporation*, 697 F.Supp. 677, 692 (same). Further, "the function of the reviewing court is not to substitute its judgment for that of the parties to the decree but to assure itself that the terms of the decree" meet this standard. *United States v. Hooker Chems. and Plastics Corp.*, 540 F.Supp. 1067, 1072 (W.D.N.Y.1982), aff'd on other grounds, 749 F.2d 968 (2d Cir. 1984).

## B. Fairness

■ The fairness of a CERCLA settlement is judged in both procedural and substantive terms. *Cannons*, 899 F.2d at 86–89. "To measure procedural fairness, a court should ordinarily look to the negotiation process and attempt to gauge its candor, openness, and bargaining balance." *Cannons*, 899 F.2d at 86; *Arizona v. Nucor Corp.*, 825 F.Supp. 1452, 1456 (D.Ariz. 1992), aff'd, 66 F.3d 213 (9th Cir.1995). Factors to consider include: whether negotiation was adversarial and conducted at arms length; whether the counsel was skilled; whether extensive formal discovery or other information-sharing procedures provided the parties with adequate information. *See Cannons*, 899 F.2d at 84; *see also City of New York v. Exxon Corp.*, 697 F.Supp. at 692–93 (factors to consider include whether the settlement was entered into in good faith, whether the settlement was the product of arms length negotiations, and whether the parties had a sufficient factual record to make an informed decision about the settlement). In fact, "[t]o the extent that the process was fair and full of 'adversarial rigor,' the results come before the court with a much

greater assurance of substantive fairness." *Cannons*, 899 F.2d at 87, n. 4.

■ There can be no doubt that this settlement is the product of procedural fairness. Since March 24, 1995, Magistrate Judge Robert M. Levy has supervised this case very closely and carefully. Judge Levy has been holding settlement conferences in this matter at least since 1995. There were several tentative settlements prior to the instant one, all of which fell apart. There can be no question that the negotiations were at arms length and rigorous. The *55 Motor Avenue Co.* docket sheet contains more than 400 entries. The docket sheet indicates that the parties conducted substantial discovery. The fact that substantial discovery was conducted is confirmed by Judge Levy's extensive 2001 Report and Recommendation on Northrup Grumman Corporation's motion for summary judgment. *See 55 Motor Ave Co v. Liberty Indus. Finishing*, CV–91–0969, Report and Recommendation of Magistrate Judge Robert M. Levy (Document Number 359) (hereinafter, "R & R"). The R & R carefully discusses much of the existing documentary and testimonial evidence about the release of harmful chemicals during World War II and the Korean War. Further, if the number of counsel is any indication of quality, there can be no question that the parties in this case received superb representation. This court has not witnessed any conduct that would indicate the representation is anything other than zealous and competent. In short, this court can find absolutely no reason to question the procedural fairness of the instant settlement.

■ A settlement is substantively fair when it effectively achieves "corrective justice and accountability: a party should bear the cost of the harm for which it is legally responsible." *Cannons*, 899 F.2d

at 87. This means ensuring that liability is apportioned according to comparative fault. *Id.* Because comparative fault is often difficult to determine,

> [i]t appears very clear to us that what constitutes the best measure of comparative fault at a particular Superfund site under particular factual circumstances should be left largely to the EPA's expertise. Whatever formula or scheme EPA advances for measuring comparative fault and allocating liability should be upheld so long as the agency supplies a plausible explanation for it, welding some reasonable linkage between the factors it includes in its formula or scheme and the proportionate shares of the settling [potentially responsible parties]. Put in slightly different terms, the chosen measure of comparative fault should be upheld unless it is arbitrary, capricious, and devoid of a rational basis.

*Id.* (internal citations omitted). Once the EPA has "selected a reasonable method of weighing comparative fault, the agency need not show that it is the best, or even the fairest, of all conceivable methods." *Id.* at 88. Where, as here, "[s]ophisticated actors know how to protect their own interest, and they are well equipped to evaluate risks and rewards," the court has "little need ... to police the substantive fairness of a settlement as among settling parties." *United States v. Charles George Trucking, Inc.*, 34 F.3d 1081, 1088 (1st Cir.1994).

■ This proposed consent decree is substantively fair. As a preliminary matter, this court's familiarity with the discovery in this case has made clear that it is very difficult to establish each party's precise comparative liability. There is, however, ample evidence that much of the contamination most likely occurred in the process of constructing airplanes for military use. R & R at 2 ("The parties agree that most of the environmental contamination took place during the World War II and Korean War years, when the operations at the Liberty site consisted mainly of the manufacture of airplane parts by the Liberty Aircraft Products Corporation for Grumman Aircraft Engineering Corporation, a predecessor of Northrup Grumman Corporation [ ] and a prime contractor to the U.S. Navy for military aircraft."). United States Navy inspectors were actually present at the Site, and they inspected each and every part produced there. *Id.* at 12–13. Production of military airplanes was obviously essential to the World War II war effort. In light of the fact that (1) much of the contamination occurred in the process of producing equipment essential to America's national security, and (2) military officials were actually present at the Site where the contamination was occurring, holding the Government liable for approximately 40% of the cost of the cleanup is fair.

With respect to the private defendants, all except two are to remain jointly and severally liable for all of the work. As a result, there is absolutely no basis for questioning the fairness of the comparative liability of these defendants. This court is aware of no reason why any one of these defendants should not be held jointly and severally liable. Similarly, Beazer East, Inc. and Koch–Glitsch, LP are jointly and severally liable for a payment of $1,254,000, and this court is aware of no reason why this is unfair.

## C. Reasonableness

The *Cannons* court announced several factors that a district court should consider when determining whether a CERCLA settlement is reasonable: "the decree's likely efficaciousness as a vehicle for cleansing the environment;" whether the public will be compensated for the actual

and anticipated costs of the remedial measures; and the relative strength of the parties' litigating positions. *Cannons*, 899 F.2d at 89–90.

 In this case, the EPA has concluded that this remedial plan will protect the environment and the people who live in it. No one has come forward to challenge the efficacy of the proposed remedial plan. With the exception of Plume B contamination, the proposed remedy is comprehensive and effective.[2] Although the proposed plan does not provide for the cleanup of Plume B, this court is confident that the environment will be best protected by beginning cleanup of the non-Plume B contamination immediately and proceeding with an investigation and cleanup of Plume B contamination separately. Because the proposed agreement does not immunize any of the defendants (including the DOD and GSA) from future liability for Plume B contamination, the fact that Plume B will be dealt with separately does not weigh in favor of rejecting the proposed consent decree.

The proposed consent decree will adequately compensate the public for the costs of the cleanup. Virtually all of the private defendants remain jointly and severally liable for the cost and implementation of the remedial plan. *See* Consent Judgment at ¶¶ 6(a), 7, 12–22, and 91(h). Although the DOD and GSA will pay for a portion of the cleanup, as discussed above, there is every indication that they are liable for a substantial portion of the contamination.

The South Farmingdale Water District and the Massapequa Water District ("Water Districts"), in comments the United States Department of Justice, state that those liable for the contamination should reimburse the water districts for past and future monitoring costs. Appendix to Memorandum of Law in Support of Motion of USA to Enter Consent Judgment ("Gov't Mem. Appx.") Ex. A at 2. Specifically, the Water Districts argue that they incurred the costs of installing two of the six monitoring wells at a cost totaling $500,000. *Id.* Further, there are future monitoring costs that the Water Districts estimate will amount to $30,000 annually. *Id.* The Water Districts also state that the contamination forced them to relocate a well at a cost of approximately $1 million. *Id.* Finally, the Water Districts request that the Consent Judgment be amended to require the potentially responsible parties be held liable for unanticipated future costs resulting from the contamination. *Id.* In response, the Government has stated that it does not have the authority under CERCLA to recover costs incurred by private entities and that the Water Districts should bring their own action to recover these costs. After all, there is nothing in the proposed consent decree that precludes the Water Districts from bringing claims against the defendants, DOD or GSA to recover these costs. The court notes that the Water Districts have not submitted any objections to the proposed consent decree. The court reads this failure to object to mean that while the Water Districts would prefer to be compensated for their costs, they would

---

**2.** The court notes that, in their comments to the United States Department of Justice, the Water Districts requested that the Consent Judgment be amended to include certain additional monitoring precautions. *See* Gov't Mem. Appx. Ex. at 3–4. The Water Districts have not submitted any objections to the Con-

sent Judgment. As a result, although it is clear that the Water Districts would prefer that this additional monitoring occur, the Water Districts' comments provide an insufficient basis for questioning the efficacy of the monitoring provided for in the proposed Consent Judgment.

prefer for the court to permit the proposed agreement to go forward in the hopes of completing the remedial plan as quickly as possible. It may be that the costs resulting from hazardous materials continuing to spread into the Water Districts' water supply to far exceed the monitoring costs the Water Districts' have already incurred. Needless to say, because the Water Districts have not actually objected to the proposed consent decree, and because they remain able seek compensation independently in a subsequent action, the court finds that the proposed decree will not saddle the public with any costs of the cleanup for which the Government and the public are not responsible.

Finally, it is abundantly clear that the Government is not in a strong bargaining position. The mere fact that this litigation has been ongoing for fifteen years and settlement discussions have been ongoing for almost a decade indicates that this is the case. Further, the Government is at least partially liable and the nature of the evidence in this case, and lack thereof, means that the Government has a very difficult case. Because the remedial plan will adequately decontaminate the Site, the public will not be saddled with an unjust portion of the cost of the cleanup, and the Government's case involves substantial uncertainties, this proposed consent decree is reasonable.

**D. Fidelity to the Statute**

An analysis of whether the settlement agreement complies with the purposes of CERCLA necessarily involves the reasonableness and fairness considerations described above. *See Cannons*, 899 F.2d at 90–91. The Second Circuit has described the goals of CERCLA:

> CERCLA must be construed liberally to effectuate its two primary goals: (1) enabling the EPA to respond efficiently and expeditiously to toxic spills, and (2)

holding those parties responsible for the releases liable for the costs of the cleanup. In that way Congress envisioned the EPA's costs would be recouped, the Superfund preserved, and the taxpayers not required to shoulder the financial burden of a nationwide cleanup.

*B.F. Goodrich v. Murtha*, 958 F.2d 1192, 1198 (2d Cir.1992).

 For the reasons described above, the proposed consent decree meets these two crucial goals. As discussed above, the proposed remedial plan is effective. Further, work on the remedial plan should begin immediately: although the consent judgment requires the settling defendants to propose a contractor within fifteen days after the judgment is entered, the defendants have already proposed a contractor, and the EPA has approved the contractor. *See* Consent Judgment at ¶ 12(a); Thantu Dec. at ¶ 9. As discussed above, the proposed consent judgment holds the responsible parties liable for the harm that they caused.

**III. CONCLUSION**

For the reasons described above, the Government's motion to enter the Consent Judgment is GRANTED. As per the Consent Judgment, this court retains jurisdiction for the purpose of enforcing the Consent Judgment. The Clerk of the Court is directed to enter judgment pursuant to Fed.R.Civ.P. 58. The Clerk of the Court is also directed to close CV–04–1308. Those parties to CV–91–0968 with claims that survive the Consent Judgment shall contact Magistrate Judge Levy's chambers immediately in order to set up a status conference. This court intends to expedite the disposition of those claims.

SO ORDERED.