**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

STATE OF ARIZONA,
    *Plaintiff-Appellee*,

v.

CITY OF TUCSON,
  *Intervenor-Plaintiff–Appellee*,

v.

ASHTON COMPANY INCORPORATED
CONTRACTORS AND ENGINEERS;
BALDOR ELECTRIC COMPANY; DON
MACKEY OLDSMOBILE CADILLAC,
INC.; DUNN-EDWARDS
CORPORATION; DURODYNE, INC.;
FERSHA CORPORATION; FLUOR
CORPORATION; GENERAL DYNAMICS
CORPORATION; GOODYEAR TIRE &
RUBBER COMPANY; LOCKHEED
MARTIN CORPORATION; HOLMES
TUTTLE FORD, INC.; INDUSTRIAL
PIPE FITTINGS, LLC; TUCSON
FOUNDRY & MANUFACTURING
INCORPORATED; ROWE ENTERPRISES
INCORPORATED; PIMA COUNTY
COMMUNITY COLLEGE DISTRICT;
ROLLINGS CORPORATION; TEXTRON
INCORPORATED; ABB
INCORPORATED; COMBUSTION

No. 12-15691

D.C. No.
4:10-cv-00634-
CKJ

OPINION

ENGINEERING INCORPORATED;
TEXAS INSTRUMENTS, INC.; TUCSON
DODGE INCORPORATED; WARNER
PROPELLER & GOVERNOR
COMPANY, LLC; FLUOR
ENTERPRISES, INC.,
            *Defendants-Appellees*,

v.

RAYTHEON COMPANY; PIMA
COUNTY,
            *Intervenors-Appellants*,

UNIVERSITY OF ARIZONA; ARIZONA
BOARD OF REGENTS; TOMKINS
INDUSTRIES, INC.; TUCSON AIRPORT
AUTHORITY; TUCSON ELECTRIC
POWER COMPANY,
    *Intervenor-Defendants–Appellants*.

Appeal from the United States District Court
for the District of Arizona
Cindy K. Jorgenson, District Judge, Presiding

Argued and Submitted
February 10, 2014—San Francisco, California

Filed August 1, 2014

Before: Consuelo M. Callahan and Milan D. Smith, Jr.,
Circuit Judges, and Edward R. Korman, Senior District
Judge.[*]

Opinion by Judge Milan D. Smith, Jr.;
Partial Concurrence and Partial Dissent by Judge Callahan

## SUMMARY[**]

### Environmental Law

The panel affirmed in part and reversed in part the district court's order approving consent decrees in an action under the Comprehensive Environmental Response Compensation and Liability Act.

The panel reaffirmed that a district court has an obligation to independently scrutinize the terms of CERCLA consent decrees by, among other things, comparing the proportion of total projected costs to be paid by the settling parties with the proportion of liability attributable to them. The panel concluded that the district court properly declined to issue declaratory relief regarding intervening parties' future CERCLA liability because the intervenors did not request such relief in their complaints. The panel further held that the district court erred in entering the parties' proposed CERCLA

---

[*] The Honorable Edward R. Korman, Senior District Judge for the U.S. District Court for the Eastern District of New York, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

consent decrees, because the court failed to independently scrutinize the terms of the agreements, and in so doing, afforded undue deference to the Arizona Department of Environmental Quality.

Judge Callahan concurred in part and dissented in part. She agreed with Part I of the majority's decision where it concluded that the district court properly denied the intervenors' request for declaratory relief. She dissented from Part II of the majority's decision because she would conclude that the district court properly approved the proposed consent decrees.

## COUNSEL

Jennifer B. Anderson (argued), Kevin D. Neal, Lori L. Voepel, and Erin E. Richardson, Jones, Skelton & Hochuli, PLC., Phoenix, Arizona; Harlan C. Agnew, Pima County Attorney's Office, Tucson, Arizona; Cynthia T. Kuhn, Kuhn Young Law Firm, PLLC, Tucson, Arizona; Charles A. Bischoff, Jorden Bischoff & Hiser, PLC, Scottsdale, Arizona; James J. Dragna and Denise G. Fellers, Bingham & McCutchen, Los Angeles, California; James Francis Murphy, Adler Murphy & McQuillen LLP, Chicago, Illinois; and Robert M. Jackson, Honigman Miller Schwartz & Cohn, Detroit, Michigan, for Intervenor–Defendants–Appellants.

Jeffrey Cantrell (argued), Tom Horne, Tamara Huddleston, and Anthony Young, Office of the Arizona Attorney General, Phoenix, Arizona, for Plaintiffs-Appellees.

Christopher D. Thomas (argued) and Matthew L. Rojas, Squire Sanders, LLP, Phoenix, Arizona; Patrick J. Paul and

Martha E. Gibbs, Snell & Wilmer LLP, Phoenix, Arizona; Eric Lukingbeal, Robinson & Cole LLP, Hartford, Connecticut; Edward A. Cohen, Thompson Coburn LLP, St. Louis, Missouri; Carla A. Consoli and Jon Weiss, Lewis and Roca LLP, Phoenix, Arizona; Richard M. Yetwin, Michael R. Urman, John C. Richardson, and John Charles Emerson Barrett, DeConcini McDonald Yetwin & Lacey, P.C., Tucson, Arizona; Randolph G. Muhlestein, Musick Peeler & Garrett, LLP, Los Angeles, California; John F. Cermak, Jr. and Sonja A. Inglin, Baker & Hostetler LLP, Los Angeles, California; Phillip F. Fargotstein and Theresa Dwyer-Federhar, Fennemore Craig PC, Phoenix, Arizona; Joel L. Herz, Law Offices of Joel L. Herz, Tucson, Arizona; Charles S. Price and Mariscal Weeks, McIntyre & Friedlander, PA, Phoenix, Arizona; Mary T. Holohan, Fluor Enterprises, Inc., Irving, Texas; Howard T. Roberts, Jr., Goering, Roberts, Rubin, Brogna, Enos & Treadwell-Rubin, P.C., Tucson, Arizona; Alan N. Bick and Heather D. Hearne, Gibson, Dunn & Crutcher LLP, Irvine, California; Jeffrey G. Baxter and Sean E. Brearcliffe, Rusing Lopez & Lizardi, PLLC, Tucson, Arizona; Dennis A. Rosen, Law Offices of Dennis A. Rosen, Tucson, Arizona; Mitchell J. Klein, Polsinell Shughart, PC, Phoenix, Arizona; Jeremy A. Lite, Quarles & Brady LLP, Tucson, Arizona; Stephen D. Hoffman, Lewis Brisbois Bisgaard & Smith, LLP, Phoenix, Arizona, for Defendants-Appellees.

## OPINION

M. SMITH, Circuit Judge:

In this appeal, we address a district court's obligation to scrutinize the terms of a proposed consent decree under the Comprehensive Environmental Response Compensation and Liability Act, 42 U.S.C. § 9601–75 (CERCLA). In so doing, we reaffirm that a district court has an "obligation to independently scrutinize the terms of [such agreements]," by, *inter alia*, comparing "the proportion of total projected costs to be paid by the [settling parties] with the proportion of liability attributable to them." *United States v. Montrose Chem. Corp. of Cal.*, 50 F.3d 741, 747 (9th Cir. 1995) (internal quotation marks and emphasis omitted).

We conclude that the district court properly declined to issue declaratory relief regarding the intervening parties' (Intervenors) future CERCLA liability. We further hold that the district court erred in entering the parties' proposed CERCLA consent decrees, because the court failed to independently scrutinize the terms of the agreements, and in so doing, afforded undue deference to the Arizona Department of Environmental Quality (ADEQ). We therefore affirm in part, reverse in part, and remand for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

This case concerns liability under CERCLA and its state law counterpart, the Arizona Water Quality Assurance Revolving Funds (WQARF), A.R.S. § 49-281–391, for cleanup costs resulting from the contamination of the

Broadway-Patano Landfill Site (the Site)—a hazardous waste site in Tucson, Arizona.

In January 2009, following an extensive investigation by the ADEQ, the State of Arizona filed a petition in the United States District Court for the District of Arizona, seeking to preserve the testimony of Ernest Joseph Blankinship—an elderly witness who had extensive knowledge of the Site's contamination. During the course of the proceedings, several parties, who were potentially responsible for the Site's contamination (i.e., potentially responsible parties), approached the State seeking to enter into early settlement agreements, releasing them from additional liability under CERCLA and WQARF.

On June 18, 2010, the State sent early settlement offers to those parties who requested early agreements, and the State ultimately reached eighteen proposed agreements with twenty-two parties. The proposed agreements require the settling parties to pay specified damages to the State, in exchange for a full release of liability under CERCLA and WQARF. Consistent with Section 113(f)(2) of CERCLA, the proposed agreements further release the settling parties from any obligation to pay contribution to non-settling parties in the future. *See* 42 U.S.C. § 9613(f)(2).

In order to obtain judicial approval of the proposed agreements under 42 U.S.C. § 9613(f)(2), the State initiated this action against the settling parties (Defendants-Appellees), alleging liability for the Site's cleanup under CERCLA and WQARF. Shortly thereafter, the State filed public notice of its intent to enter into consent decrees with the Defendants-Appellees. A number of non-settling parties filed comments

objecting to the proposed consent decrees and the State filed responses.

On March 11, 2011, the State filed a motion to enter the consent decrees. The State's motion explained that the total estimated cost of remediation was $75 million, and that the State calculated the liability of the settling parties to be *de minimis*—0.01% to 0.2% of the total cost. Several potentially responsible parties, who were not parties to the settlements, subsequently moved to intervene in the action.[1] The district court granted these motions over the State's objection.[2]

---

[1] The State informed Intervenors that the State considered them to be potentially responsible parties for contamination at the Site. The State sent each Intervenor a settlement offer, but Intervenors rejected these agreements.

[2] After granting the motions to intervene, the court ordered the parties to brief whether additional discovery was necessary prior to the court's ruling on the State's motion to enter consent decrees. The State took the position that additional discovery was not necessary. Intervenors disagreed. The court ultimately declined to order formal discovery, but instead ordered the State to supplement its motion to enter consent decrees with "additional information regarding the [] formula/methodology used to calculate settlement amounts." On appeal, Intervenors challenge the district court's order denying formal discovery.

"[B]road discretion is vested in the trial court to permit or deny discovery, and its decision to deny discovery will not be disturbed except upon the clearest showing that denial of discovery results in actual and substantial prejudice to the complaining litigant." *Hallett v. Morgan*, 296 F.3d 732, 751 (9th Cir. 2002) (internal quotation marks omitted). Here, the district court did not abuse its discretion in ordering the State to provide additional information through supplemental briefing, in lieu of ordering formal discovery.

Intervenors opposed the State's motion to enter the consent decrees. In so doing, they primarily argued that the State did not provide sufficient information for the parties or the court to determine whether the consent decrees were substantively "fair, reasonable, and consistent with CERCLA's objectives." *Montrose*, 50 F.3d at 748. Intervenors' brief in opposition to the motion further requested a court order declaring that the State could not, in the future, hold Intervenors jointly and severally liable for costs related to the Site's cleanup.[3]

The district court denied Intervenors' request for declaratory relief and issued a twelve-page opinion approving the consent decrees. The district court's opinion lays out the procedural background of this case and the legal framework under which proposed CERCLA consent decrees are reviewed. Although the district court recognized its obligation to independently scrutinize the terms of the settlements, the district court did not engage in a substantive analysis of the settlements' terms. In approving the consent decrees, the court declined to even discuss the parties' individual or aggregate settlement amounts, and merely deferred to the ADEQ's judgment that "the public interest is best served through entry of th[e] agreement[s]." Intervenors timely appealed.

---

[3] Throughout this litigation, the State has asserted that WQARF prohibits the State from holding Intervenors jointly and severally liable in future litigation. CERCLA contains no such limitation. *See Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 614 (2009) (liability under CERCLA is generally joint and several).

**JURISDICTION AND STANDARD OF REVIEW**

We have jurisdiction under 28 U.S.C. § 1291. We review a district court's grant or denial of declaratory relief for abuse of discretion. *Cal. Ass'n of Rural Health Clinics v. Douglas*, 738 F.3d 1007, 1011 (9th Cir. 2013). We also review the approval of a consent decree for abuse of discretion. *Turtle Island Restoration Network v. U.S. Dep't of Commerce*, 672 F.3d 1160, 1165 (9th Cir. 2012) (citing *Montrose*, 50 F.3d at 746). For the following reasons, we affirm in part, vacate in part, and remand.

**DISCUSSION**

**I.  The District Court Properly Denied Intervenors' Request for Declaratory Relief**

We affirm the district court's order denying Intervenors' request for declaratory relief, because this request was not properly before the district court.

Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02, "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration . . . ." 28 U.S.C. § 2201.

A request for declaratory relief is properly before the court when it is pleaded in a complaint for declaratory judgment. *Kam-Ko Bio-Pharm Trading Co. Ltd-Australasia v. Mayne Pharma (USA) Inc.*, 560 F.3d 935, 943 (9th Cir. 2009). Requests for declaratory judgment are not properly before the court if raised only in passing, or by motion. *Id.* (denying "motion for declaratory judgment" because such a

motion is "inconsistent with the Federal Rules" (internal quotations marks omitted)).

Here, Intervenors' request for declaratory relief was not properly before the district court. Intervenors did not request this relief in their complaints. Rather, they requested an order regarding their future liability in their brief opposing the State's motion to enter the consent decrees. If Intervenors wish to obtain a declaratory judgment, they must either file a separate action seeking such relief, or move to amend their complaints on remand. *Id*.

## II. The District Court Erred in Entering the Consent Decrees

We vacate and remand the district court's order approving the consent decrees, because the court failed to independently scrutinize the terms of the agreements, *see Montrose*, 50 F.3d at 747–48, and in so doing, afforded undue deference to the ADEQ.

### A. Legal Standard

#### 1. CERCLA

"CERCLA is a comprehensive statute that [among other things] grants the President broad power to command government agencies and private parties to clean up hazardous waste sites." *Key Tronic Corp. v. United States*, 511 U.S. 809, 814 (1994). We have explained:

> [T]he Federal Government may clean up a contaminated area itself . . . or it may [seek an injunction to] compel responsible parties to

> perform the cleanup . . . . Under the first option . . . the government pays for the cleanup [using Superfund money] under § 9604 and then seeks recovery for its costs from [potentially responsible parties] under § 9607. This option has an obvious drawback for the government: It must pay first and sue for recovery of costs later (often in protracted litigation). The second option—compelling [potentially responsible parties] to perform the cleanup—therefore has its advantages.

*City of Rialto v. W. Coast Loading Corp.*, 581 F.3d 865, 869 (9th Cir. 2009) (internal quotations and citations omitted).

CERCLA also encourages states, localities, and private parties to assist in the cleanup of hazardous waste sites. Under Section 104, a state may enter into a contract with the Environmental Protection Agency (EPA), pursuant to which both the state and the EPA engage in cleanup efforts on a cost-sharing basis. 42 U.S.C. § 9604(c), (d). A state may also independently engage in CERCLA remediation efforts, so long as those efforts are not inconsistent with the EPA's National Contingency Plan. *See New York v. Shore Realty Corp.*, 759 F.2d 1032, 1047–48 (2d Cir. 1985).

CERCLA imposes strict liability on certain classes of parties who are potentially responsible for a site's contamination. *Burlington*, 556 U.S. at 608; *Anderson Bros., Inc. v. St. Paul Fire and Marine Ins. Co.*, 729 F.3d 923, 929 (9th Cir. 2013). Under Section 107(a), the federal government or a state can sue responsible parties for "all costs of removal or remedial action incurred by the United States Government

or a State . . . not inconsistent with the [EPA's] [N]ational [C]ontingency [P]lan." 42 U.S.C. § 9607(a)(4)(A).**[4]**

CERCLA liability is generally joint and several, *see Anderson*, 729 F.3d at 926, 930, and a defendant seeking to avoid joint and several liability "bear[s] the burden of proving that a reasonable basis for apportionment exists," *Burlington*, 556 U.S. at 614. A defendant who is held jointly and severally liable under Section 107 may, however, seek contribution from other responsible parties under Section 113(f)(1). 42 U.S.C. § 9613(f)(1); *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 162–63 (2004).

### 2.  Early Settlements

"Congress sought through CERCLA . . . to encourage settlements that would reduce the inefficient expenditure of public funds on lengthy litigation." *Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.*, 710 F.3d 946, 971 (9th Cir. 2013) (quoting *In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 119 (2d Cir. 1992)). Consistent with this objective, Section 113(f)(2) provides that a party who has resolved its CERCLA liability through a judicially approved consent decree "shall not be liable [to other responsible parties] for claims for contribution

---

**[4]** The state need not obtain EPA authorization to engage in CERCLA remediation efforts and to recover costs under Section 107. *Shore Realty*, 759 F.2d at 1047–48 ("[W]e reject [the] argument that the State's response costs are not recoverable because the State has failed to . . . obtain[] EPA authorization . . . . Congress envisioned states' using their own resources for cleanup and recovering those costs from polluters under section 9607(a)(4)(A). We read section 9607(a)(4)(A)'s requirement of consistency with the [National Contingency Plan] to mean that states cannot recover costs inconsistent with the response methods outlined in the [EPA's National Contingency Plan].").

regarding matters addressed in the settlement." 42 U.S.C. § 9613(f)(2). This statutory framework contemplates that potentially responsible parties who do not enter into early settlement agreements may ultimately bear a disproportionate share of the CERCLA liability. For this reason, potentially responsible parties who do not enter into such agreements have standing to intervene in CERCLA actions to oppose the entry of CERCLA consent decrees. *United States v. Aerojet Gen. Corp.*, 606 F.3d 1142, 1150–53 (9th Cir. 2010).

### 3. Standard of Review

In order to approve a CERCLA consent decree, a district court must conclude that the agreement is procedurally and substantively "fair, reasonable, and consistent with CERCLA's objectives." *Montrose*, 50 F.3d at 748. "Fair" and "reasonable" are comparative terms. *Id.* at 747. Thus, in order to approve a CERCLA consent decree, a district court must find that the agreement is "based upon, and roughly correlated with, some acceptable measure of comparative fault, apportioning liability among the settling parties according to rational (if necessarily imprecise) estimates of how much harm each [potentially responsible party] has done." *United States v. Charter Int'l Oil Co.*, 83 F.3d 510, 521 (1st Cir. 1996) (quoting *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 87 (1st Cir. 1990)).

In approving a CERCLA consent decree, the district court has an "obligation to independently scrutinize the terms of [the agreement]." *Montrose*, 50 F.3d at 747 (internal quotation marks omitted). In so doing, the court must "gauge the adequacy of settlement amounts to be paid by settling [parties by comparing] the proportion of total projected costs to be paid by the settlors with the proportion of liability

attributable to them, and then . . . factor into the equation any reasonable discount for litigation risks, time savings, and the like . . . ." *Id.* (emphasis omitted); *Charter Int'l Oil*, 83 F.3d at 515 (holding that the district court's assessment must include "an appraisal of what the government is being given by the [settling party] relative to what the [settling party] is receiving"). A district court abuses its discretion where it does not fulfill its obligation to engage in this comparative analysis. *Montrose*, 50 F.3d at 746–47.

We have further explained that the district court's review of a CERCLA consent decree may not be made in an "informational vacuum," or where the record contains "no evidence at all on an important point." *Id*. But, the mere fact that evidence sufficient to evaluate the terms of an agreement is either before the court or purportedly in the parties' possession is not alone sufficient. The district court must actually engage with that information and explain in a reasoned disposition why the evidence indicates that the consent decrees are procedurally and substantively "fair, reasonable, and consistent with CERCLA's objectives." *Id.* at 748. As we have explained in other contexts: "Without some indication or explanation of how the district court arrived at [its conclusion], it is simply not possible for this court to review [the district court's determination] in a meaningful manner," and we have no way of knowing whether the district court abused its discretion. *Padgett v. Loventhal*, 706 F.3d 1205, 1208 (9th Cir. 2013) (internal quotation marks omitted).

## B.  Application

Although the district court recognized its obligation to independently scrutinize the settlements, "[a]cknowledging

that obligation and fulfilling it . . . are two different things."
*Montrose*, 50 F.3d at 746. And here, the district court failed
to adequately review the agreements.

*Montrose* requires that the district court "gauge the
adequacy of settlement amounts to be paid by settling
[parties]" by engaging in a comparative analysis. *Id*. at 747.
But nowhere in the district court's opinion is there an analysis
comparing each party's estimated liability with its settlement
amount, or an explanation of why the settlements are "fair,
reasonable, and consistent with CERCLA's objectives." *Id*.
at 748. The court's entire numerical analysis is found in a
single footnote, which provides: "The State's analysis
indicates that, based upon a preliminary estimate of remedial
action costs of $75 Million, the range of liability for each
settling party extended from 0.01% of the estimated total
clean up costs to 0.2%, or as expressed in dollar figures, from
$10,000.00 to $150,750.00." The opinion goes on to
acknowledge, however, that the State did not provide any
evidence supporting this estimated liability, or even
"information from which the [district court could] confirm
that the settling parties are [in fact] *de minimis* contributors."
The opinion even fails to mention the parties' individual or
aggregate settlement amounts.

Rather than engaging in the analysis that *Montrose*
requires, the district court merely accepted the State's
representation that the settlements were substantively fair and
reasonable because: "[t]he State . . . informed the Court of the
factual bases (files, interviews, documents) for its conclusions
. . . [and] explained the methods (software, past costs,
estimates) to reach remediation costs." In so doing, the court
did not fulfill its responsibilities to independently assess the

adequacy of the agreements and to provide a reasoned explanation for its decision.

In declining to substantively engage with the parties' proposed agreements, the district court further explained that "review of the specific evidence relating to each party would require [the district court] to conduct an in-depth review of the evidence, second guess the agency, and deny the required deference to [the] ADEQ." According to the district court, it must defer to the ADEQ's judgment "unless it is arbitrary, capricious, and devoid of any rational basis."**[5]**

As the First Circuit has observed, "almost all of the law regarding approval of CERCLA consent decrees comes from cases in which the [EPA is] a party." *City of Bangor v. Citizens Commc'ns Co.*, 532 F.3d 70, 89 (1st Cir. 2008). In such cases, the approval of a CERCLA consent decree "reaches the appellate level 'encased in a double layer of swaddling.'" *Montrose*, 50 F.3d at 746 (quoting *Cannons*, 899 F.2d at 84); *see also United States. v. George A. Whiting Paper Co.*, 644 F.3d 368, 372 (7th Cir. 2011). The first layer of swaddling requires the district court to "refrain from second-guessing the Executive" and to defer to the EPA's expertise. *Montrose*, 50 F.3d at 746 (quoting *Cannons*,

---

**[5]** The State argues that under 42 U.S.C. § 9607(f)(2)(C) the State's judgment is entitled to a "rebuttable presumption of correctness." But this "presumption of correctness" specifically applies to an appointed trustee's natural resource damage assessment that is performed pursuant to the procedures set out in 42 U.S.C. § 9651(c). No such assessment is at issue here.

899 F.2d at 84).**[6]** This is so, because "considerable weight [is] accorded to [a federal] executive department's construction of a statutory scheme it is entrusted to administer . . . ." *Mead*, 533 U.S. at 227–28 (internal quotation marks omitted). We then defer to the district court's judgment and review its approval of the proposed agreement for abuse of discretion. *Montrose*, 50 F.3d at 746.

But where a state, as opposed to the federal government, is a party to a proposed CERCLA consent decree, we do not defer to the state to the same degree as we would the federal government.**[7]** *Bangor*, 532 F.3d at 93–94. In *Montrose* we

---

**[6]** The deference we owe to a federal agency's administration of statutes it is charged with enforcing varies with the circumstances. *United States v. Mead Corp.*, 533 U.S. 218, 227–28 (2001). While the courts of appeals agree that the EPA is afforded significant deference when it seeks judicial approval of a proposed CERCLA consent decree, courts have not established whether the deference that we afford the EPA is the deference described in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), the deference described in *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), or some other type of deference.

**[7]** Our dissenting colleague faults us for discussing deference and suggests that the issue of whether the district court abused its discretion in approving the consent decrees can be separated from "[the] different issue" of the degree to which a district court ought to defer to a state's decision to enter into an early settlement under CERCLA. While these two issues may be "different," they are inextricably intertwined. We cannot decide whether a judge abused her discretion in approving a consent decree without deciding what degree of deference is owed to the party proposing the agreement. This is so because the threshold issue in deciding whether a district court abused its discretion is whether the district court "identified the correct legal rule to apply to the relief requested." *Perry v. Brown*, 667 F.3d 1078, 1084 (9th Cir. 2012) (internal quotation marks omitted). For this reason, if the district court applied the wrong deferential standard of review in assessing the consent decrees, we must hold that the court abused its discretion for that reason alone.

adopted the First Circuit's "double-swaddling" test to review CERCLA consent decrees sponsored by the EPA. Nonetheless, we declined to apply or discuss this test in *Arizona v. Components Inc.*, 66 F.3d 213, 215 (9th Cir. 1995), a case involving a state sponsored CERCLA settlement, which we decided just six months after *Montrose*. In *Components*, we merely held that there was sufficient evidence before the district court for it to review the state-sponsored consent decree and that the district court properly reviewed that evidence. *Id.* at 216–17. We declined to discuss what, if any deference, was owed to the state agency's interpretation of CERCLA.

The First Circuit has similarly declined to apply its "double-swaddling" standard to CERCLA consent decrees sponsored by state agencies. In *Bangor*, the First Circuit held:

> Federal courts generally defer to a state agency's interpretation of those statutes it is charged with enforcing, but not to its interpretation of federal statutes it is not charged with enforcing.

> We choose to accord some deference to [the state's] decision to sign onto the [c]onsent [d]ecree, but not the same amount of deference we would accord the EPA in a consent decree involving the United States. We give deference in recognition that the state agency has some expertise. This lesser deference does not displace the baseline standard of review for abuse of discretion.

*Bangor*, 532 F.3d at 94 (internal citations omitted).

We find the reasoning of the First Circuit on this issue persuasive, and we hold that where state agencies have environmental expertise they are entitled to "some deference" with regard to questions concerning their area of expertise. But "[a] state agency's *interpretation of federal statutes* is not entitled to the deference afforded [to] a federal agency's interpretation of . . . statutes" that it is charged with enforcing. *Orthopaedic Hosp. v. Belshe*, 103 F.3d 1491, 1495 (9th Cir. 1997) (emphasis added); *see also Bangor*, 532 F.3d at 94. Applying these principles, if the district court finds that the ADEQ has expertise concerning the cleanup of the Site, it may afford "some deference" to the ADEQ's judgment concerning the environmental issues underlying the CERCLA consent decrees at issue in this case.[8] The ADEQ is not entitled to deference, however, concerning its interpretation of CERCLA's mandate. Nor may the district court abdicate its responsibility to independently determine that the agreements are "fair, reasonable, and consistent with CERCLA's objectives," *Montrose*, 50 F.3d at 748, by deferring to the ADEQ's judgment that the agreements satisfy *Montrose*.[9]

---

[8] State agencies, including those charged with enforcing environmental laws, may vary from state to state in terms of their competence, their resources, and their philosophies concerning the enforcement of environmental laws. These considerations are ones that a district judge may properly take into account in assessing the deference owed to an agency's expertise.

[9] The dissent concedes that whether a particular agreement is "fair, reasonable, and consistent with CERCLA's objectives," *Montrose*, 50 F.3d at 748, "may present questions of statutory interpretation." *See Orthopaedic Hosp.*, 103 F.3d at 1495–96 ("[a] state agency's interpretation of federal statutes is not entitled to the deference afforded [to] a federal agency's interpretation of . . . statutes" that it is charged with enforcing).

**CONCLUSION**

Even if the EPA had been a party to the proposed consent decrees in this case, the district court would have failed to fulfill its duty to independently scrutinize the parties' agreements, as required by *Montrose*. That error is compounded where, as here, the court deferred completely to a state agency's judgment that the proposed agreements were fair, reasonable, and consistent with federal law. *See id*.

For these reasons, we vacate the district court's order entering the consent decrees, and we remand for the court to reconsider the agreements under the principles set forth in this opinion. In reaching this conclusion, we express no opinion as to whether the consent decrees at issue in this case ought to be affirmed on remand, after the district court has fulfilled the responsibilities discussed in this opinion.[10]

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED.**

---

[10] The dissent has undertaken a review of the record *de novo*, and, having done so, concludes that there is sufficient evidence in the record to approve the consent decrees. This is contrary to the law of our circuit. The decision of whether to approve consent decrees in the first instance is entrusted to the sound discretion of the district court, not to our court. For this reason, if a district court fails to engage in the appropriate analysis, we are required to remand for the district court to complete its work. *See Montrose*, 50 F.3d at 743, 748.

CALLAHAN, Circuit Judge, concurring, in part, and dissenting, in part:

I agree with Part I of the majority's decision where it concludes that the district court properly denied the intervening parties' ("Intervenors") request for declaratory relief and did not abuse its discretion in denying the Intervenors' request for formal discovery. However, because I would conclude that the district court properly approved the proposed consent decrees, I dissent from Part II of the majority's decision.

The issue on appeal is whether the district court **abused its discretion** in approving consent decrees that the State of Arizona entered into with a number of potentially responsible parties ("PRPs") under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601–75. In the process of deciding that question, however, the majority raises and decides— incorrectly in my opinion—a different issue: the degree to which a district court ought to defer to a state's decision to enter into an early settlement with PRPs under CERCLA. Although the majority recognizes that state agencies may have environmental expertise and be entitled to "some deference" with regard to "environmental issues," it goes on to suggest that the states and their environmental agencies are entitled to no deference in their decisions to enter into early settlements with PRPs. In doing so, the majority fails to recognize the critical role that Congress envisioned for the states under CERCLA and expands the level of scrutiny required for state-sponsored CERCLA settlements. The majority's decision is inconsistent with the principles that guide our review of consent decrees in general and the decisions of our sister circuits in this context. The

decision will ultimately make it more difficult for states to play the role that Congress envisioned for them in remediating the numerous polluted sites that blight our nation. Applying the proper level of deference in this case, I would hold that the district court did not abuse its discretion when it approved the consent decrees.

I

Arizona brought this action seeking remediation costs that it incurred and expected to incur under CERCLA, 42 U.S.C. § 9607(a), and Arizona's parallel law, the Water Quality Assurance Revolving Fund ("WQARF"), Arizona Revised Statutes § 49-285. As the majority acknowledges, several PRPs approached Arizona early on during its investigation seeking to enter into settlements. Arizona sent early settlement offers to all PRPs. After reaching agreements with some of them, Arizona filed the present action and shortly thereafter, filed a motion seeking approval of the consent decrees.

The district court subsequently ordered Arizona to supplement its motion. Arizona then submitted an affidavit with supporting materials from Ana I. Vargas, an Arizona Department of Environmental Quality ("ADEQ") chemical engineer. Vargas explained that ADEQ relied on EPA guidelines that allocate responsibility by PRP category (i.e., owner/operator, transporter, generator/arranger). Applying these guidelines, ADEQ reviewed the available information to come up with responsibility allocations for each PRP. For example, owners' and operators' allocations were largely based on length of ownership or operation, while generators' and transporters' allocations were based primarily on volume. Thus, ADEQ allocated each generator a share of liability

based on volume and other factors which was multiplied by 0.60 (corresponding to the 60% allocation for generators/arrangers), which resulted in a final apportionment of liability for the generator.   Vargas also provided a breakdown of ADEQ's $75 million total cost estimate, of which, the settlements totaled $512,000.   ADEQ then multiplied each PRP's share of liability by the cost estimate to arrive at an individualized settlement offer for each PRP. Accordingly, under ADEQ's formula, each settling defendant paid damages directly corresponding to ADEQ's estimated apportionment of liability.

The allocations were based upon ADEQ's review of 800 witness interviews and 100,000 pages of documents and its analysis of "information about the site to determine those areas about which it had no information."   Arizona provided that information to the Intervenors.   Although Vargas did not specify how ADEQ arrived at each PRP's specific allocation or settlement figure, she explained that ADEQ had proceeded in accord with EPA guidelines, which provide that "EPA will not provide a detailed explanation for the results due to the enforcement-sensitive nature of the discussions involved."

The Intervenors argued that Arizona had not supplied enough information for the court to approve the consent decrees because it had not specified what information it used to arrive at each PRP's apportionment of liability or the cost calculation for each PRP.   In its decision approving the consent decrees, the district court observed that courts "give deference to the government's evaluation of" proposed consent decrees, citing *Arizona ex rel. Woods v. Nucor Corp.*, 825 F. Supp. 1452, 1456 (D. Ariz. 1992), *aff'd on other grounds sub nom. Arizona v. Components Inc.*, 66 F.3d 213, 215 (9th Cir. 1995).   The court then reviewed the record, and

relying heavily on Vargas's affidavit, determined that
Arizona had provided sufficient information for it to evaluate
the settlements. The district court noted: "The State's
analysis indicates that, based upon a preliminary estimate of
remedial action costs of $75 Million, the range of liability for
each settling party extended from 0.01% of the estimated
total clean up costs to 0.2%, or as expressed in dollar figures,
from $10,000.00 to $150,750.00." The district court further
explained:

> The State has informed the Court of the
> factual bases (files, interviews, documents)
> for its conclusions. It has explained the
> methods (software, past costs, estimates) to
> reach remediation costs. Although the Court
> agrees with Intervenors that the State has not
> provided the Court with specific factual
> details as to each settling party (e.g., witness
> N of the 800 witnesses stated that settling
> party X deposited a specified tonnage of a
> specified type of waste), such in-depth review
> of the facts and circumstances is not
> appropriate. Indeed, although Intervenors
> argue that such review is needed, Intervenors
> have not pointed to any controlling precedent
> that requires such in-depth review.

The district court observed that it was not its "role to
determine whether the settlement agreement is the best
possible settlement that ADEQ could have achieved, but
rather whether it is within the reaches of the public interest."
It concluded that the proposed consent decrees were
reasonable and in the best interests of the public.

II

The majority concludes that the district court applied the wrong level of deference to ADEQ's judgment. It declares that "where state agencies have environmental expertise they are entitled to 'some deference' with regard to questions concerning their area of expertise." However, it then concludes that the district court erred in deferring to ADEQ's judgment that the agreements were "fair, reasonable, and consistent with CERCLA's objectives."[1]

I cannot agree. Congress gave the states a critical role to play in CERCLA enforcement that will be severely undermined by the majority's decision. Moreover, we defer to the EPA's decision to settle with PRPs in light of: (a) our recognition of CERCLA's policy of encouraging settlements; (b) recognition that the settlements are constructed by a party acting in the public interest; (c) respect for the EPA's expertise; and (d) respect for an arms-length agreement. These considerations are equally applicable to state

---

[1] I note that the parties did not raise the level of deference owed to ADEQ as a consequence of it being a state agency before the district court or on appeal. I would hold that the Intervenors forfeited any such argument by failing to raise it in their opening brief. *See Avenetti v. Barnhart*, 456 F.3d 1122, 1125 (9th Cir. 2006) (finding that the Social Security Commissioner waived an argument that deference applies to an administrative law judge's interpretation of a disability listing by failing to argue it in his opening brief). The majority reaches this issue by proclaiming ipse dixit that it is "inextricably intertwined" with the "correct legal rule." Curiously, although we were confronted with the same exact scenario in *Arizona v. Components*, 66 F.3d 213, 215 (9th Cir. 1995), we **affirmed** the district court. What the majority has really done is invented a new legal rule, retroactively evaluated the district court's decision against it, and faulted the district court for failing to anticipate it.

environmental agencies, which accordingly are also entitled to significant deference.[2]

A

Congress enacted CERCLA "in response to the serious environmental and health risks posed by industrial pollution." *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009). "The Act was designed to promote the timely cleanup of hazardous waste sites and to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination." *Id.* (internal quotation marks omitted). CERCLA provides a number of powers to the President, who has delegated most of his authority to the EPA, "[t]o ensure the prompt cleanup of hazardous waste sites." *Pakootas v. Teck Cominco Metals, Ltd.*, 452 F.3d 1066, 1072 & n.11 (9th Cir. 2006).

Although states do not have as large of a role as the EPA does in enforcing CERCLA, Congress envisioned a crucial role for the states in remediating hazardous waste sites. Most significantly, Congress provided that the various categories of PRPs "shall be liable for" certain remediation costs "incurred by the United States Government **or a State** or an Indian Tribe." 42 U.S.C. § 9607(a) (emphasis added); *see also Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 120 (2d Cir. 2010) ("CERCLA empowers the federal government **and the states** to initiate comprehensive cleanups and to seek recovery of expenses associated with those cleanups." (emphasis added)).

---

[2] The importance of this issue is underscored by the fact that the States of Colorado and Nevada filed a letter brief supporting Arizona's position less than one month after the issue was initially raised.

Congress also envisioned that states would play a central role by enforcing CERCLA through early settlements. One of CERCLA's central purposes is to encourage "early settlement between PRPs and environmental regulators." *Anderson Bros., Inc. v. St. Paul Fire & Marine Ins. Co.*, 729 F.3d 923, 929–30 (9th Cir. 2013) (citation and alteration marks omitted). PRPs have a strong incentive "to participate in settlement talks at the earliest possible opportunity because 'non-settling PRPs may be held jointly and severally liable for the entire amount of response costs minus the amount of the settlement.'" *Id.* at 930 (citation and alteration marks omitted). This is because settlements provide settling parties with protection against contribution actions from other PRPs:

> A person who has resolved its liability to the United States **or a State** in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement. Such settlement does not discharge any of the other potentially liable persons unless its terms so provide, but it reduces the potential liability of the others by the amount of the settlement.

42 U.S.C. § 9613(f)(2) (emphasis added). Nonetheless, a settling PRP may still seek contribution from non-settling PRPs. § 9613(f)(3)(B). Thus, as the First Circuit has observed: "Congress has . . . recognized a special role for states in authorizing judicial approval for consent decrees in which the state is a party, and then authorizing both contribution protection and contribution claims." *City of Bangor v. Citizens Commc'ns Co.*, 532 F.3d 70, 90 (1st Cir. 2008). States can therefore act independently to definitely

resolve a PRP's CERCLA liability without authorization from the EPA. *Niagara Mohawk*, 596 F.3d at 127.[3]

Indeed, the EPA itself has recognized that "because of the number and variety of contaminated sites across the country, states play a critical role in effectuating the purposes of CERCLA." *Id.* at 126 (alteration marks omitted) (quoting the EPA's amicus brief). The EPA has elaborated:

> When Congress first enacted [CERCLA] in 1980, it required States to be active partners in conducting Superfund response actions. . . . CERCLA, as amended, strengthens the partnership between the Federal Government and State and local authorities. State and local governments play an important role in ensuring effective, efficient and well-coordinated cleanups.

EPA, Pub. No. 9375.5-01/FS, *State and Local Involvement In the Superfund Program* (1989).

As a practical matter, state participation in CERCLA enforcement is absolutely necessary because there are more contaminated sites than the EPA is capable of addressing on

---

[3] CERCLA also provides special roles for states in other contexts, such as allowing them to pursue claims for damages to their natural resources. *See* § 9607(f). States are also "given a special role in defining allowable costs and cleanup standards." *City of Bangor*, 532 F.3d at 91. Specifically, state remediation efforts are presumed to be consistent with the "national contingency plan," which consists of EPA "procedures for preparing and responding to contaminations." *Id.* at 91 & n.8. CERCLA also gives states the authority to enforce any applicable state or federal standard. *Id.* at 91 (citing § 9621(e)).

its own.  As several commentators have explained, under CERCLA:

> the role of the States at national priorities list (NPL) sites ranges from required cost sharing at federally funded cleanups to active site management.  A vast number of contaminated sites do not meet the criteria for inclusion on the NPL.  For these non-NPL sites the federal government's role is likely to be limited to site assessment and emergency response or removal activities.  For many non-NPL sites, the federal government may not be involved at all.  Thus, if any government-supervised activity is to occur at non-NPL sites, States will have to oversee, enforce, or fund cleanups.  For these reasons, the role of the States in addressing contaminated sites, independently and in concert with the federal government, has become increasingly important.

Linda K. Breggin, James McElfish & John Pendergrass, *State Superfund Programs on Overview of the Environmental Law Institute's (ELI'S) 1998 Research*, *Alb. L. Envtl. Outlook*, Winter 1999, at 1; *see also* Caroline N. Broun & James T. O'Reilly, *CERCLA Players and Their Roles*, in 1 *RCRA and Superfund: A Practice Guide* § 10:3 (3d ed. 2013) (indicating that the states are "key players in Superfund").

Indeed, there are an estimated 450,000 contaminated sites in the nation.  *See* Ronald G. Aronovsky, *A Preemption Paradox: Preserving the Role of State Law in Private Cleanup Cost Disputes*, 16 N.Y.U. Envtl. L.J. 225, 232

(2008) (citing S. Rep. No. 107-2, at 15 (2001)) [hereinafter, *Preemption Paradox*]. Yet, less than 2,000 sites are listed on the EPA's national priorities list. *See* U.S. Environmental Protection Agency, *National Priorities List (NPL)*, http://www.epa.gov/superfund/sites/npl/ (listing sites as of Feb. 27, 2014). Thus, without state participation, most contaminated sites will remain polluted. *Preemption Paradox*, *supra*, at 233 ("The federal government, through the . . . EPA[], plays an active regulatory role at only a small percentage of the nation's contaminated sites. Instead, a state or local government agency serves as the lead regulatory authority at the vast majority of sites."). Practical considerations also preclude states from proceeding solely under state law. Although many states—like Arizona—have their own parallel laws, settling parties, desiring greater certainty, will insist on CERCLA contribution protection and judicial approval.[4]

## B

The seminal decision on CERCLA consent decrees is *United States v. Cannons Engineering Corp.*, 899 F.2d 79 (1st

---

[4] *Compare Consolidated Edison Co. of N.Y., Inc. v. UGI Utilities, Inc.*, 423 F.3d 90, 95–97 (2d Cir. 2005) (concluding that a state law settlement did not affect the settling party's CERCLA liability, and therefore, did not allow the party to seek contribution under CERCLA), *and General Time Corp. v. Bulk Materials, Inc.*, 826 F. Supp. 471, 475–76 (M.D. Ga. 1993) (concluding that a settlement of state law liability did not provide contribution protection under CERCLA), *with* Ronald G. Aronovsky, *Federalism and CERCLA: Rethinking the Role of Federal Law in Private Cleanup Cost Disputes*, 33 Ecology L.Q. 1, 66 n.289 (2006) ("Generally, settlements with some but not all PRPs at a site are difficult to obtain without contribution protection for the settling party; a PRP will be unlikely to settle a cleanup cost lawsuit with the plaintiff only then to be sued for contribution by the non-settling defendants.").

Cir. 1990). Drawing on the legislative history of § 9613, the First Circuit concluded that, when evaluating consent decrees, "the trial court's review function is only to 'satisfy itself that the settlement is reasonable, fair, and consistent with the purposes that CERCLA is intended to serve.'"[5] *Id.* at 85 (quoting H.R. Rep. No. 99-253, pt. III, at 19 (1985), *reprinted in* 1986 U.S.C.C.A.N. 3038, 3042). Thus, the First Circuit determined that district courts should evaluate consent decrees according to their fairness, reasonableness, and fidelity to the statute. *Id.* at 85–90. As that court subsequently observed, these factors are "similar to the one[s] used by courts when reviewing consent decrees generally." *City of Bangor*, 532 F.3d at 93. We are in accord. *See Turtle Island Restoration Network v. U.S. Dep't of Commerce*, 672 F.3d 1160, 1165 (9th Cir. 2012) ("A district court may approve a consent decree when the decree is 'fair, reasonable and equitable and does not violate the law or public policy.'" (citation omitted)).

In *Cannons*, the First Circuit further observed that:

> We approach our task mindful that, on appeal, a district court's approval of a consent decree in CERCLA litigation is encased in a double layer of swaddling. In the first place, it is the policy of the law to encourage

---

[5] As is relevant here, the courts' judicial review function originates with 42 U.S.C. § 9613(f)(2). CERCLA separately sets forth procedures—including judicial approval—for settlements between the United States and private parties under § 9622, which do not apply here. *See City of Bangor*, 532 F.3d at 93. Notably, § 9613(f)(2) refers to "an administrative or judicially approved settlement," indicating that **administrative** approval is sufficient to provide contribution protection to PRPs settling with state agencies.

settlements. That policy has particular force
where, as here, a government actor committed
to the protection of the public interest has
pulled the laboring oar in constructing the
proposed settlement. While "the true measure
of the deference due depends on the
persuasive power of the agency's proposal
and rationale, given whatever practical
considerations may impinge and the full
panoply of the attendant circumstances," the
district court must refrain from second-
guessing the Executive Branch.

Respect for the agency's role is
heightened in a situation where the cards have
been dealt face up and a crew of sophisticated
players, with sharply conflicting interests, sit
at the table. That so many affected parties,
themselves knowledgeable and represented by
experienced lawyers, have hammered out an
agreement at arm's length and advocate its
embodiment in a judicial decree, itself
deserves weight in the ensuing balance. The
relevant standard, after all, is not whether the
settlement is one which the court itself might
have fashioned, or considers as ideal, but
whether the proposed decree is fair,
reasonable, and faithful to the objectives of
the governing statute. Thus, the first layer of
insulation implicates the trial court's
deference to the agency's expertise and to the
parties' agreement. While the district court
should not mechanistically rubberstamp the
agency's suggestions, neither should it

approach the merits of the contemplated settlement de novo.

899 F.2d at 84 (citations omitted). Thus, the First Circuit's rationale for deferring to the EPA rested on: (a) CERCLA's policy of encouraging settlements; (b) its recognition that the settlements are constructed by a government actor committed to protect the public interest; (c) respect for the agency's expertise; and (d) respect for an arms-length agreement reached by sophisticated parties. The court distilled these factors from decisions discussing judicial approval of consent decrees in a variety of circumstances. *See id.* (citing cases). The court further explained that the "second layer of swaddling" is the deferential nature of appellate review for a district court's decision approving a consent decree. *Id.* We adopted this framework in *United States v. Montrose Chemical Corp.*, 50 F.3d 741, 743, 746 (9th Cir. 1995).

## C

Few courts have been called upon to consider what level of deference district courts should accord to state-sponsored consent decrees. Nonetheless, two of our sister circuits have addressed this issue and provided persuasive guidance. In *City of Bangor v. Citizens Communications Co.*, 532 F.3d 70 (1st Cir. 2008), the First Circuit decided to accord "some deference" to the state agency. It explained:

> The question becomes what deference, if any, should be given to a state agency which is not charged with implementing CERCLA. We recognize the [Maine Department of Environmental Protection ("DEP")] does have a mandate under state law to "prevent, abate

and control the pollution of the air, water and
land and preserve, improve and prevent
diminution of the natural environment of the
State."

Federal courts generally defer to a state
agency's interpretation of those statutes it is
charged with enforcing, but not to its
interpretation of federal statutes it is not
charged with enforcing.

We choose to accord some deference to
Maine's decision to sign onto the Consent
Decree, but not the same amount of deference
we would accord to the EPA in a consent
decree involving the United States. We give
deference in recognition that the state agency
has some expertise. The lesser deference does
not displace the baseline standard of review
for abuse of discretion.

*Id.* at 94 (citations omitted). Arguably, the First Circuit
overstated the case when it suggested that states are "not
charged with implementing CERCLA," as they do have
substantial roles under the statute as discussed above.
Nonetheless, the First Circuit recognized that state agencies
are still due "some deference" when courts evaluate a state
environmental agency's decision to enter into a consent
decree.

In *Commissioner v. Esso Standard, Oil S.A.*, 326 F.3d
201, 205 (3d Cir. 2003), the district court approved a
CERCLA consent decree between the Virgin Islands'
Department of Planning and Natural Resources and several

settling PRPs.  The Third Circuit affirmed.  *Id.* at 210.  In doing so, the court accorded deference to the territorial agency, explaining: "there is deference to the administrative agencies' input during consent decree negotiations and the law's policy of encouraging settlement.  Where the appropriate agency has reviewed the record and has made a reasonable determination of fault and damages, that determination is owed some deference." *Id.* at 207.  Thus, although the Third Circuit did not explicitly address how this level of deference differed from the level of deference owed to the EPA, it plainly recognized that the EPA was not a party and still accorded deference to the territorial agency.

We previously had an opportunity to address this issue, but declined to do so.  In *Arizona ex rel. Woods v. Nucor Corp.*, 825 F. Supp. 1452, 1459 (D. Ariz. 1992), the non-settling PRPs argued that the district court lacked sufficient technical data to approve the settlement, including information regarding the extent of contamination, cleanup cost, and apportionment of liability.  The district court reviewed the information submitted by Arizona (including an affidavit from Vargas) and found that the there was adequate support for the settlement. *See id.* at 1459–65.  Throughout its analysis, the court suggested that it was according ADEQ deference, noting that its role was "not to determine the best method for measuring fault and apportioning liability, but rather to uphold the method proposed by the ADEQ unless it is 'arbitrary, capricious, and devoid of a rational basis.'" *Id.* at 1459.  We affirmed on appeal without discussing the level of deference owed to a state environmental agency, holding that the district court did not abuse its discretion. *See Arizona v. Components Inc.*, 66 F.3d 213, 215 (9th Cir. 1995).  The most noteworthy aspect of our decision in *Components* is that

we did not do what the majority does here: fault the district court for deferring to ADEQ.

Thus, although we have not specifically addressed the issue, both the First and Third Circuits have accorded at least some deference to state or territorial agencies that entered into CERCLA consent decrees. *City of Bangor*, 532 F.3d at 94; *Esso Standard*, 326 F.3d at 207. The Eighth Circuit has also suggested that state agencies are entitled to deference when enforcing federal environmental laws. *See Comfort Lake Ass'n, Inc. v. Dresel Contracting, Inc.*, 138 F.3d 351, 357 (8th Cir. 1998) (according "considerable deference" to administrative enforcement agreement between a state agency and a polluter for violations of the federal Clean Water Act). These decisions conflict with the majority's suggestion that state environmental agencies are entitled to no deference in determining whether an agreement is fair, reasonable, and consistent with CERCLA's objectives.[6]

Moreover, the factors discussed by the First Circuit in *Cannons* support extending significant deference to state environmental agencies. *See* 899 F.2d at 84. Like the EPA, state environmental agencies possess expertise and are charged with protecting the public interest. Although Congress did not give state agencies as large a role in CERCLA enforcement as the EPA, Congress still contemplated extensive state involvement. Moreover, given the scope of the environmental problems we face as a nation,

---

[6] Although the majority indicates that it finds *City of Bangor* "persuasive," in that case, the First Circuit "accord[ed] some deference to [the state agency's] decision to sign onto the Consent Decree." 532 F.3d at 94. The majority proclaims that the district court erred by doing so here.

as a practical matter, state involvement is absolutely necessary. Similarly, CERCLA's policy of encouraging settlements is not diminished merely because a state entity is involved rather than the federal government. Furthermore, just as EPA-sponsored settlements may result from arms-length agreements reached by sophisticated parties, so may those involving state environmental agencies. Thus, most of the reasons favoring deference to EPA-sponsored settlements also favor deference to state-sponsored settlements.

In any event, the proper level of deference in any given case is not strictly dictated by the identity of the governmental actor involved. As the First Circuit explained in *Cannons*, even in cases involving the EPA, there is no set level of deference. Rather, the level of deference depends upon the "the persuasive power of the agency's proposal and rationale, given whatever practical considerations may impinge and the full panoply of the attendant circumstances." *Cannons*, 899 F.2d at 84 (citation omitted). Thus, in all cases involving CERCLA consent decrees, there is a spectrum of possible deference that a district court may accord to the decision to settle, depending on the particular circumstances of the case. At its zenith, deference will be highest for well-supported consent decrees involving the EPA. As our sister circuits have acknowledged, however, it does not follow that state agencies are not entitled to deference concerning their decision to sign on to a consent decree. Accordingly, while the degree of deference may vary depending on the circumstances of the particular case, state-sponsored settlements are entitled to deference when a court assesses a settlement's fairness, reasonableness, and benefit to the public.

D

As explained above, judicial deference to the EPA in CERCLA consent decrees evolved from the standards courts use when evaluating consent decrees in general. Instead of focusing on the grounds for deference, the majority seems to treat this case as if it presented a statutory interpretation issue. Statutory interpretation is the focus of cases such as *United States v. Mead Corp.*, 533 U.S. 218 (2001), *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), and *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). Similarly, our opinion in *Orthopaedic Hospital v. Belshe*, 103 F.3d 1491, 1495–96 (9th Cir. 1997), stands for the unremarkable proposition that state agency interpretations of federal statutes that the agencies are not charged with enforcing are not entitled to *Chevron* deference. But this case does not turn on a question of statutory interpretation.

Most CERCLA consent decree actions do not present questions about whether the agency's implementation of a particular statutory provision (or filling of a statutory gap) is entitled to deference. *Cf. Mead*, 533 U.S. at 229. Nor do they generally involve an agency regulatory or adjudicatory rulemaking—or even less formal agency policy statements, manuals, or enforcement guidelines—which may have broad implications for third parties and unrelated controversies. *Cf. id.* at 233–34. Instead, most cases involving CERCLA consent decrees focus primarily on whether the agency made a reasonable and fair assessment in a particular case. This is not a question of statutory interpretation, but rather of the exercise of the authority and discretion lodged with the agency. Considerably more so than judges, state environmental agencies are perfectly capable of making those determinations.

One of the factors that we use when evaluating consent decrees is whether they are "consistent with the purposes that CERCLA is intended to serve." *Montrose*, 50 F.3d at 743 (citation omitted). In some cases—but not here—applying this factor may present questions of statutory interpretation. In those cases, all other things being equal, a state sponsored-consent decree would be entitled to less deference than an EPA-sponsored consent decree. But most often, determining consistency with CERCLA will only require a rote assessment of whether the decree complies with CERCLA's well-pronounced goals and is in the public interest.[7]  *Cf. United States v. Charles George Trucking, Inc.*, 34 F.3d 1081, 1086 (1st Cir. 1994) (indicating that the "overarching goals of CERCLA" include "accountability, the desirability of an unsullied environment, and promptness of response activities" (quoting *Cannons*, 899 F.2d at 91)). State agencies are equally capable of undertaking this assessment as is the EPA. Thus, a state agency like ADEQ is entitled to some deference concerning its determination that a particular agreement is "fair, reasonable, and consistent with CERCLA's objectives."

### III

Applying the proper level of deference owed to a state environmental agency, I would hold that the district court did not abuse its discretion in approving the consent decrees here. The majority's reliance on *Montrose* to reach the opposite conclusion is misplaced. In *Montrose*, 50 F.3d at 743, we vacated the district court's approval of the consent decree and

---

[7] Indeed, we, along with our sister circuits, have occasionally formulated this factor as whether the settlement is consistent with "the public interest." *Montrose*, 50 F.3d at 747; *Esso Standard*, 326 F.3d at 206.

remanded. We explained that the district court had to compare the proportion of projected costs to be paid by the settling defendants with the proportion of liability attributable to them, taking into account "reasonable discounts for litigation risks, time savings, and the like that may be justified." *Id.* at 747 (citing *Charles George Trucking*, 34 F.3d at 1087). The district court had "no evidence at all" upon which to base any assessment of the government's estimates of responsibility and damage, and thus it could not evaluate the reasonableness and fairness of the decree. *Id.* at 746–48. In particular, the district court had largely relied on a special master's assessment of the settlement without independently evaluating the damage estimate. *Id.* at 746. Thus, we found that the district court had neglected its "obligation to independently 'scrutinize' the terms of [the] settlement."[8] *Id.* at 747. We accordingly remanded for the district court to:

> determine the proportional relationship between the [amount] to be paid by the settling defendants and the governments' current estimate of total potential damages. The court should evaluate the fairness of that proportional relationship in light of the degree of liability attributable to settling defendants.

*Id.* at 747 (citing *Charles George Trucking*, 34 F.3d at 1087). Notably, as the Seventh Circuit recognized, *see United States v. George A. Whiting Paper Co.*, 644 F.3d 368, 373 (7th Cir.

---

[8] The majority repeatedly suggests that the district court here failed to independently scrutinize the agreements, citing this language. Unlike *Montrose*, where the district court had relied on the special master almost completely, the district court evaluated the agreements itself in this case.

2011), *Montrose* remains the only example of a circuit court reversing a district court's approval of a CERCLA consent decree for lack of a factual basis before the majority's decision in this case.

Here, the record before the district court shows that under ADEQ's formula, each settling defendant paid damages directly corresponding to ADEQ's estimated degree of liability. It does not appear that ADEQ provided the settling defendants with any discount for litigation risks or time savings, even though such discounts are permissible under *Montrose*, 50 F.3d at 747. A settlement corresponding precisely to the settling defendant's estimated share of liability is necessarily reasonable. *See Charles George Trucking*, 34 F.3d at 1087 (noting that a settlement was favorable to the government agencies where the payment corresponded to the group's share of responsibility multiplied by the highest estimate of clean-up costs). Moreover, although ADEQ did not specifically set forth the settlement amount and share for each settling defendant, it did provide the district court with a basis for evaluating its estimates by explaining its methodology in detail and setting out the total value of the settlements and anticipated costs. Requiring ADEQ to list the settlement amounts and share of liability for each settling defendant would be pointless when there is no dispute that the estimate and settlement share are the same. *Cf. Cannons*, 899 F.2d at 87 ("The logic behind these concepts dictates that settlement terms must be based upon, and roughly correlated with, some acceptable measure of comparative fault, apportioning liability among the settling parties according to rational (if necessarily imprecise) estimates of how much harm each PRP has done.").

The Intervenors' arguments here resemble arguments that the First Circuit rejected in *Charles George Trucking*. In that case, the First Circuit affirmed a settlement even though the appellants contended that the district court had failed to explain the allocation of responsibility either within or among the classes of defendants. 34 F.3d at 1086–88. The First Circuit observed that it is not always possible to explain an allocation of liability in minute detail given an incomplete historical record. *Id.* at 1088. Although we did not specifically discuss these arguments, we repeatedly cited *Charles George Trucking* with approval in *Montrose*, 50 F.3d at 746–47.

The question here is whether the PRPs are entitled to know specifically how ADEQ developed its estimate for the shares of liability attributable to each settling defendant. As the First Circuit explained in *Cannons*, however, this is an area where the courts will typically defer to the EPA in light of its expertise. 899 F.2d at 87 ("[W]hat constitutes the best measure of comparative fault at a particular Superfund site under particular factual circumstances should be left largely to the EPA's expertise."). Indeed, at an early stage in the process, some of the state's allocations are necessarily based on qualitative information and expert experience rather than strict quantitative analysis. Accordingly, the district court properly deferred to ADEQ's choice of measuring comparative fault, which was adequately explained and supported.[9]

---

[9] Even the majority concedes that ADEQ may have similar expertise to the EPA. Indeed, among other things, ADEQ is statutorily charged with: protecting the environment; protecting the quality of the air and water; abating air and water pollution; restoring and reclaiming polluted areas; regulating the storage, handling, and transportation of pollutants; ensuring

Instead of following our precedents, the majority takes the district court to task for failing to "substantively engage with the parties' proposed agreements." The majority requires the district court on remand to wade deep into the abyss of liability allocation and decide not only whether the settlement amounts are fair and reasonable, but also gauge the accuracy of ADEQ's allocation against a 100,000 page record and technical guidelines. As a practical matter, requiring a district court to delve into the details of how an agency allocated responsibility within a category of PRPs based on factual information concerning a variety of measures (e.g., volume, toxicity, etc.) will consume considerable resources and require expertise that most judges do not possess. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 148 (1997) (Breyer, J., concurring) (noting that "judges are not scientists and do not have the scientific training that can facilitate the making of such decisions"). A district court should not have to

---

that state environmental laws and regulations are consistent with corresponding federal laws; and approving remediation levels. Ariz. Rev. Stat. § 49-104. More specifically, as it relates to ADEQ's work on this case, Vargas averred that she has 23 years of experience at ADEQ and was the same engineer who performed the analysis at issue in *Nucor*. Notably, when we affirmed in the district court's decision in *Nucor*, we took no issue with the district court's deference to ADEQ. *See Components*, 66 F.3d at 215.

For recognizing the factual and legal backdrop underlying the district court's decision, the majority accuses me of undertaking a de novo review and usurping the district court's role. Not so. Although I have the benefit of a post hoc perspective that necessarily comes with appellate review (not to mention knowledge of the majority's newly-fashioned legal standards), I have simply evaluated the district court's reasoning in light of the record as a whole, which we are required to do when reviewing a decision for abuse of discretion. *See, e.g.*, *McKinley v. City of Eloy*, 705 F.2d 1110, 1117 (9th Cir. 1983).

undertake the equivalent of an expert deposition every time it is asked to approve a state-sponsored CERCLA consent decree.[10]

Here, the Intervenors have not suggested that the information in the record points to some other estimate of the settling defendants' liability; they simply claim that the record was inadequate. This is insufficient to carry the "heavy burden" that the Intervenors bear to show that district court's approval of the consent decree was an abuse of discretion. *See Esso Standard*, 326 F.3d at 207. It is obvious that the Intervenors are contesting the consent decrees because they do not like the deals they were offered by ADEQ. As is their right, they refused ADEQ's settlement offers. But they have no right to a settlement offer of their choice. Indeed, the purpose of judicial review is to ensure that proposed settlements further the public interest by holding polluters responsible for the damage that they caused.[11] It is not to guarantee PRPs a good deal.

The Intervenors' intent appears to be to hold up fair and reasonable consent decrees with settling PRPs in order to

---

[10] To the extent that the majority's opinion merely requires the district court to further explain its findings that are obvious from the record, it is promoting form over substance.

[11] *See United States v. Rohm & Haas Co.*, 721 F. Supp. 666, 680 (D.N.J. 1989) ("The court's core concern in deciding whether to approve this proposed decree is with ensuring that the decree furthers the public interest as expressed in CERCLA."); H.R. Rep. No. 99-253, pt. III, at 19 (1985) (indicating that the primary reason for judicial review was to "protect against improper or 'bad faith' settlements."); H.R. Rep. No. 99-253, pt. I, at 59 (1985), *reprinted in* 1986 U.S.C.C.A.N. 2835, 2841 (stating that judicial review was intended to guard against "[s]weetheart deals" and ensure that agreements were "in the public interest.").

create more leverage in their negotiations with ADEQ.[12] Such delay is not in the public interest. *Cf. United States v. Asarco, Inc.*, 430 F.3d 972, 983 (9th Cir. 2005) (noting that the purpose of a consent decree is "to enable parties to avoid the expense and risk of litigation while still obtaining the greater enforceability (compared to an ordinary settlement agreement) that a court judgment provides"). The majority's approach gives polluters more power in their negotiations with the states and is more likely to push the states to bypass judicial approval and opt for administrative settlements (as they are entitled to do under 42 U.S.C. § 9613(f)(2)), denying the judiciary the opportunity to protect the public interest by ensuring that the states are not cutting sweetheart deals with those polluters.

IV

The majority's conclusion appears to be founded upon the flawed premise that state environmental agencies entering consent settlements under CERCLA are entitled to no deference concerning their conclusion that a settlement is fair and reasonable. In doing so, the majority fails to appreciate the origins of CERCLA deference. Moreover, the majority

---

[12] The Intervenors claim that they fear being held jointly and severally liable for the settling parties' shares of liability should those shares exceed the settlement amounts. However, the consent decrees provide that if the settling parties' shares are eventually deemed to be greater than the settlement amount, "the difference shall be deemed an orphan share of liability pursuant to" Arizona Revised Statutes § 49-281(10). Under state law, Arizona is responsible for funding orphan shares. *See* Ariz. Rev. Stat. § 49-282(E)(2)(e). At oral argument, the Intervenors expressed a fear that the law could change. However, the consent decrees provide that the terms "have the meanings assigned to them under WQARF and CERCLA as of the date this Consent Decree becomes final."

vastly and unwisely expands the required level of judicial scrutiny for CERCLA consent decrees.  The majority's decision will significantly restrict state agencies' ability to enter into early CERCLA consent decrees to the detriment of the environment, the statutory framework envisioned by Congress, and PRPs seeking to resolve their liability early in the process.  I respectfully dissent.